**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**S. Mohammad MARASHI,**
**Defendant–Appellant.**

**No. 89–30145.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 4, 1990.

Decided Sept. 5, 1990.

---

15. *See* section II.A. *supra.*

Michael J. Hemovich and Carl J. Oreskovich, Hemovich, Nappi, Oreskovich & Butler, Spokane, Wash., for defendant-appellant.

Carroll D. Gray, Asst. U.S. Atty., Spokane, Wash., for plaintiff-appellee.

Before HALL, THOMPSON and LEAVY, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

A jury convicted appellant S. Mohammad Marashi on four counts of a five count indictment. It convicted him of three counts of attempted tax evasion in violation of 26 U.S.C. § 7201 (1988) and one count of willful subscription to a false tax return in violation of 26 U.S.C. § 7206(1). Marashi claims on appeal that (1) the district court abused its discretion by admitting evidence of marital communications; (2) the government committed reversible *Brady* error; (3) the district court abused its discretion by admitting evidence of prior bad acts; and (4) the evidence was insufficient to convict him.

We have jurisdiction under 28 U.S.C. § 1291 (1988) and we affirm.

I

A

In the late summer of 1984, Sharon Smith Marashi ("Smith") learned that her husband, Dr. S. Mohammad Marashi was having an extramarital affair with his secretary, Mrs. Sherrie Danzig. Smith also learned from the secretary's husband, Steve Danzig, that the two had flown off to Europe. In August, Smith and Danzig's brother-in-law, Earl Doering, entered Marashi's office in an attempt to obtain Marashi's travel itinerary. Because Smith did not have a key to Marashi's desk, she had a locksmith open the top drawer.

Marashi returned from Europe to discover that his wife was filing for divorce. Several months later, on December 22, 1984, he moved out of their house and into a condominium.

Filing for divorce was not enough for Smith and Danzig. They met several times to discuss how to get even with their unfaithful spouses. At one point, Smith mentioned that Marashi had underreported his federal income tax for some years. Seeing an opportunity to exact revenge upon his rival, Danzig contacted the IRS. Later, he pressured Smith to come forward with information implicating Marashi.

In December, 1984, Smith came forward. She phoned the IRS and set up an interview with Special Agent Robert Lake. Smith, accompanied by her divorce lawyer, Carl Maxey, spoke briefly with Agent Lake on January 10, 1985. Agent Lake took notes. Smith began to relate how her husband had used her to underreport their income for several years. Upon realizing that Smith was implicating herself as a tax evader, Agent Lake terminated the interview in order to permit Smith to consult with her lawyer.

On January 16, Smith, unaccompanied by counsel, met with Agent Lake again. Agent Lake tape recorded the interview. He declined to give Smith a *Miranda* warning and suggested instead that if she were honest and cooperative, she would not be prosecuted.

Smith then described how Marashi had enlisted her aid to evade federal income taxes. She explained that daily her husband would bring home slips of paper indicating how much patients had paid him. Marashi would then store the slips in a desk drawer located in his study. Periodically, he would ask Smith to record the information from the slips into either a black ledger for that year or a stenographer's notebook. Marashi would highlight certain items of income and instruct Smith to enter them into the notebook for his own records; this income went unreported to the IRS. Next, he would instruct her to enter the remaining items of income into

that year's black ledger, which he kept as an official record for audit purposes. Marashi would then discard the slips of paper.

Smith added that Marashi had employed this double-ledger scheme at least from 1981–84. She estimated that the unreported income contained in the stenographer's notebook ran into the thousands.

Agent Lake then asked Smith to obtain both the black ledgers and the notebook. However, Smith never made the attempt because as far as she knew, they remained in the desk which Marashi had recently moved into his condominium.

Shortly after the interview, the Marashi investigation was reassigned to Special Agent Stephen Houghton. On May 18, the IRS opened a case file on Marashi. Roughly a month later, Agent Houghton contacted Marashi and summoned him to produce corporate records. He also began an investigation of Marashi's bank transactions in an effort to reconstruct his income.[1] That investigation revealed that Marashi had cashed, rather than deposited, numerous checks for substantial sums.

Meanwhile, the IRS cultivated its relationship with Sharon Smith. Agent Thomas Abrahamson spoke with her over the telephone on June 19 and 21, 1985. He took notes on both occasions. On the latter date, Smith produced several of Marashi's appointment books. On July 18, Smith returned to the IRS and recounted her story to Agents Abrahamson and Houghton. Agent Abrahamson did not take notes during the interview, but later jotted them down from memory. Agent Houghton tape recorded Smith's sworn statement.

Two days later, Agent Houghton telephoned Steve Danzig and his brother-in-law Earl Doering, who had accompanied Smith to Marashi's office in 1984. He took rough notes of these two interviews, which added nothing to Smith's claim of tax evasion.

Because the IRS could not get its hands on the black ledgers or the stenographer's notebook, the investigation slowed to a snail's pace. Marashi claimed that the black ledgers for 1981–83 had been stolen from his condominium and that the alleged notebook listing unreported income had never existed. Consequently, the IRS returned to the slow process of reconstructing Marashi's income by the bank deposits method.

B

The IRS finally obtained a criminal indictment against Marashi on March 15, 1988. The grand jury charged Marashi with four counts of attempted income tax evasion for the years 1981–84, in violation of 26 U.S.C. § 7201.[2] It also charged him with one count of subscribing to a false corporate tax return, in violation of 26 U.S.C. § 7206(1).[3]

On July 5, 1988, Marashi had his lawyers depose his ex-wife[4] to find out exactly what she had told the IRS. Several days later, the IRS provided Marashi with (1) an audio tape and a transcript of Smith's January 16, 1985 interview with Special Agent Lake and (2) an audio tape of Smith's July 18, 1985 interview with Special Agent

---

1. For a description of this sort of investigation, known as the "bank deposits method," see *United States v. Soulard*, 730 F.2d 1292, 1296 n. 1 (9th Cir.1984) (quoting *United States v. Hall*, 650 F.2d 994, 996 n. 4 (9th Cir.1981)).

2. Specifically, the government alleged the following in Counts I–IV of the indictment:

| Year | Reported Income | Alleged Income | Reported Tax Due | Alleged Tax Due | Alleged Tax Deficiency |
|------|-----------------|----------------|------------------|-----------------|------------------------|
| 1981 | $ 1,036 | $21,699 | $ 515 | $ 5,098 | $ 4,583 |
| 1982 | $40,484 | $62,764 | $11,820 | $22,088 | $10,268 |
| 1983 | $37,702 | $50,353 | $10,183 | $15,493 | $ 5,310 |
| 1984 | $31,134 | $46,759 | $ 8,379 | $14,158 | $ 5,779 |

3. Count V of the indictment charged that in his corporate income tax return for 1981, Marashi reported gross receipts of $53,636 while knowing that the real amount was $65,561.

4. The Marashi divorce had become final in September, 1986.

Houghton.[5]

On July 12, Marashi moved to suppress Smith's testimony and the fruits thereof on the basis of the marital communications privilege. Ten days later, Smith testified at a pretrial conference. On July 28, the district court denied Marashi's motion.

On October 24, Marashi filed a motion *in limine* to exclude evidence pertaining to erasures made in several of his appointment books. The district court denied this motion on November 2, the second day of Marashi's jury trial.

At the outset of the trial, Marashi freely admitted that he had had an extramarital affair with Sherrie Danzig. His defense was that his ex-wife and Steve Danzig sought revenge by fabricating the double ledger story and stealing Marashi's black ledgers for the years 1981–83 from his condominium. Any underreporting, Marashi maintained, was the product of oversight. On November 9, 1988, a jury returned a special verdict convicting Marashi of Counts I–III and V. He moved for a new trial on November 16. The district court denied the motion.

## II

Marashi first appeals the denial of his motion to suppress Smith's testimony regarding his instructions to have her (1) underreport income and (2) erase entries in his appointment books several weeks before an IRS audit. He claims that his statements are covered by the marital communications privilege. He also seeks to suppress all evidence derived therefrom as "fruits of the poisonous tree."

We review the admission of evidence for an abuse of discretion. *See United States v. Emmert*, 829 F.2d 805, 808 (9th Cir. 1987). We will reverse only if the abuse of discretion affected Marashi's substantial

5. The defense had already obtained a transcript of the July 18 interview.

6. Rule 501 provides in relevant part:
 Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the

rights. *See United States v. Shirley*, 884 F.2d 1130, 1132 (9th Cir.1989).

## A

To determine the scope and application of evidentiary privileges in federal criminal cases, we must turn to federal common law. *See* Fed.R.Evid. 501.[6] The common law recognizes two separate privileges arising out of the marital relationship. The first, which we have called the "anti-marital facts" privilege, prohibits one spouse from testifying against another during the length of the marriage. *United States v. Bolzer*, 556 F.2d 948, 951 (9th Cir.1977). Because Smith testified after she divorced Marashi, this privilege does not apply.

The second, so-called "marital communications" privilege, bars testimony concerning statements privately communicated between spouses. *In re Grand Jury Investigation of Hugle*, 754 F.2d 863, 864 (9th Cir.1985); *United States v. Lustig*, 555 F.2d 737, 747 (9th Cir.1977), *cert. denied*, 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285, 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978). The non-testifying spouse may invoke the privilege, *Hugle*, 754 F.2d at 864, even after dissolution of the marriage, *Lustig*, 555 F.2d at 747. Thus, Marashi may attempt to invoke it.

The confines of the marital communications privilege are easy to describe. First, the privilege extends only to words or acts intended as communication to the other spouse. *Pereira v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 361–62, 98 L.Ed. 435 (1954); *United States v. Lefkowitz*, 618 F.2d 1313, 1318 (9th Cir.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980); *Bolzer*, 556 F.2d at 951; *Lustig*, 555 F.2d at 748. Second, it covers only those communications made during a valid marriage, *see Hugle*, 754 F.2d at 865; *Lustig*, 555

Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

F.2d at 747, unless the couple had irreconcilably separated, *see United States v. Roberson*, 859 F.2d 1376, 1381 (9th Cir.1988). Third, the privilege applies only to those marital communications which are confidential. That is, the privilege does not extend to statements which are made before, or likely to be overheard by, third parties. *See, e.g., Pereira*, 347 U.S. at 6, 74 S.Ct. at 361–62 (statements to, or in presence of, third parties); *Lefkowitz*, 618 F.2d at 1318 (same); *United States v. McCown*, 711 F.2d 1441, 1452–53 (9th Cir. 1983) (husband's request that wife write check to purchase gun at pawn shop not confidential because no indication husband intended to keep request secret from friends living in same house).

■ Marital communications are presumptively confidential; the government has the burden of demonstrating that they are not. *Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1456 (9th Cir.1983); *United States v. Weinberg*, 439 F.2d 743, 750 (9th Cir.1971).

This last presumption notwithstanding, we have emphasized that we will narrowly construe the marital communications privilege because it obstructs the truth-seeking process. *See Roberson*, 859 F.2d at 1378. Use of the privilege in criminal proceedings requires a particularly narrow construction because of society's strong interest in the administration of justice. *Id.* at 1380.

■ Under this analysis, it is readily apparent that the privilege does not extend to Smith's testimony regarding Marashi's orders to have her erase entries in his appointment books. The presence of a third person, Marya LaSalandra, during the communications destroyed the privilege. *See Lefkowitz*, 618 F.2d at 1318.

■ It is also clear that the privilege covers Smith's testimony regarding Marashi's instructions to have her underreport income. Marashi made the statements while the marriage was legally valid. Moreover, because his instructions were

made in the privacy of the couple's bedroom, they were confidential.

The government concedes that the privilege extends to the latter testimony. It urges us to adopt a narrow exception to that rule. We consider this point below.

### B

■ Every circuit addressing the issue has held that the marital communications privilege does not apply to communications having to do with present or future crimes in which both spouses are participants. *See United States v. Parker*, 834 F.2d 408, 411 (4th Cir.1987), *cert. denied*, 485 U.S. 938, 108 S.Ct. 1118, 99 L.Ed.2d 279 (1978); *United States v. Estes*, 793 F.2d 465, 468 (2d Cir.1986); *United States v. Picciandra*, 788 F.2d 39, 43 (1st Cir.) (conspiracy to evade income taxes), *cert. denied*, 479 U.S. 847, 107 S.Ct. 166, 93 L.Ed.2d 104, *rehearing denied*, 479 U.S. 978, 107 S.Ct. 481, 93 L.Ed.2d 425 (1986); *United States v. Keck*, 773 F.2d 759, 767 (7th Cir.1985); *United States v. Sims*, 755 F.2d 1239, 1243 (6th Cir.) (adopting narrower version of exception), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985); *United States v. Neal*, 743 F.2d 1441, 1446 (10th Cir.1984), *cert. denied*, 470 U.S. 1086 (1985); *United States v. Ammar*, 714 F.2d 238, 257–58 (3d Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Mendoza*, 574 F.2d 1373, 1379–80 (5th Cir.), *cert. denied*, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978).[7]

The Second Circuit has expressed the prevailing view thus:

> The [circuits] which recognize that "partnership in crime" exception to the confidential communication privilege believe that greater public good will result from permitting the spouse of an accused to testify willingly concerning their joint criminal activities than would have come from permitting the accused to erect a roadblock against the search for truth.

*Estes*, 793 F.2d at 466.

This view is consistent with our attitude toward evidentiary privileges in general.

---

7. We have previously declined to address the issue. *See Hugle*, 754 F.2d at 866; *In re Grand Jury Proceeding of Salas*, 695 F.2d 359, 362 (9th Cir.1982).

We have emphasized that the policies underlying the marital communications privilege pale in the face of public concerns about bringing criminals to justice. *Roberson*, 859 F.2d at 1380.[8] Thus we join our sister circuits in holding that the marital communications privilege does not apply to statements made in furtherance of joint criminal activity.[9]

■ Marashi argues that in any event, the exception should not apply here because the IRS did not prosecute Smith. In rejecting a similar argument, the Fourth Circuit reasoned:

> The policies behind the joint criminal participation exception are concerned with the actual participation by both spouses in a crime, not with their joint prosecution for that crime. The exception arises out of a careful balancing of the policies behind protecting the intimacy of private marital communications and the public policy of getting at the truth and attaining justice.... Whether the spouse testifying has been indicted and is being prosecuted for his or her participation is a prosecutorial prerogative that is not material to the policies at issue here.

*Parker*, 834 F.2d at 412. We agree. The government may well decide, as it has in this case, to forego prosecution of one spouse in order to secure her testimony against the other. The greater public interest is to assure a criminal that if he enlists the aid of his spouse, he is creating a potential witness for the government.

Accordingly, the government's decision not to prosecute Smith does not preclude application of the partnership in crime exception.

■ There is little question that the communications in this case were made in furtherance of a joint criminal venture. Marashi directed Smith to help him underreport income on their *joint* income tax returns. Smith freely did so, in violation of 26 U.S.C. § 7201.[10] Accordingly, Marashi's statements in furtherance of these criminal acts were admissible under the partnership in crime exception to the marital communications privilege.

In sum, we hold that the district court did not abuse its discretion by admitting Smith's testimony.[11]

### III

Marashi next claims that the government violated his due process rights, as defined in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he claims the government committed *Brady* error by: (1) suppressing IRS interview notes containing impeachment material; (2) suppressing notes revealing the name of a private detective Steve Danzig had hired to spy on his own wife; and (3) failing to make written or tape-recorded records of all of its interviews with Smith.

■ Marashi raised the *Brady* issue in his motion for a new trial. We review de novo challenges to a conviction based on a *Brady* violation. *United States v. Kenne-*

---

**8.** We draw further support from the Supreme Court's remarks on evidentiary privileges in general: "Whatever their origins, these exceptions to the demand for every [person's] evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108–09, 41 L.Ed.2d 1039 (1974).

**9.** However, we do not embrace the Sixth Circuit's narrower version of the exception, which would apply only to statements made in furtherance of *"patently* illegal activity." *Sims*, 755 F.2d at 1243 (emphasis added).

**10.** Smith's intimate participation in the double ledger scheme renders the tax code's "innocent spouse" doctrine inapplicable. *See* 26 U.S.C.

§ 6013(e)(1)(C); *Guth v. C.I.R.,* 897 F.2d 441, 443–44 (9th Cir.1990); *Price v. C.I.R.,* 887 F.2d 959, 964–65 (9th Cir.1989).

**11.** Because we have held that the marital communications testimony is admissible, we need not resolve Marashi's claim that all evidence derived therefrom should be excluded as fruits of the poisonous tree. Suffice it to say that no court has ever applied this theory to *any* evidentiary privilege and that we have indicated we would not be the first to do so. *See Lefkowitz*, 618 F.2d at 1318 n. 8 ("Because we reject *infra* Lefkowitz's argument that the marital privileges are somehow constitutionally grounded ... we doubt that a secondary source of information obtained through information protected by the confidential marital communications privilege would in any way be 'tainted.'").

**732**

*dy*, 890 F.2d 1056, 1058 (9th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990). If we find that the district court correctly decided the *Brady* issue, we review the denial of a new trial for an abuse of discretion. *See United States v. Endicott*, 803 F.2d 506, 514 (9th Cir.1986). The appellant bears a heavy burden in demonstrating such an abuse of discretion. *United States v. Steel*, 759 F.2d 706, 713 (9th Cir.1985).

In *Brady*, the Supreme Court held that government suppression of evidence favorable to the defendant upon request is a due process violation where the evidence is material to guilt or punishment. 373 U.S. at 87, 83 S.Ct. at 1196–97. Subsequently, the Court extended this standard to require a prosecutor to provide such evidence even if the defendant does not request it. *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976).

In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court refined the concept of *Brady* materiality:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is sufficient to undermine confidence in the outcome.

*Id.* at 682, 105 S.Ct. at 3383. We have closely followed this formulation of the materiality test. *See, e.g., Kennedy*, 890 F.2d at 1058–59; *United States v. Andersson*, 813 F.2d 1450, 1458–59 (9th Cir.1987); *Reiger v. Christensen*, 789 F.2d 1425, 1432 (9th Cir.1986); *United States v. Shaffer*, 789 F.2d 682, 687–88 (9th Cir.1986).

### A

 Marashi's main *Brady* claim is that the nondisclosure of IRS interview notes prevented him from effectively impeaching Smith, the government's star witness. We have recognized that "[i]mpeachment, as well as exculpatory, evidence falls within *Brady*'s definition of evidence favorable to the accused." *Andersson*, 813 F.2d at 1458 (citing *Bagley*, 473 U.S. at 676, 105

S.Ct. at 3380); *see also United States v. Endicott*, 869 F.2d 452, 455 (9th Cir.1989); *Shaffer*, 789 F.2d at 689. However, "newly discovered evidence to impeach a government witness does not warrant a new trial when the evidence would not have affected the jury's assessment of the witness' credibility and when the witness was subjected to vigorous cross-examination." *Endicott*, 869 F.2d at 456 (citing *Steel*, 759 F.2d at 714).

Because Marashi cross-examined Smith several times at trial, the question becomes whether pretrial disclosure of the notes would have further enabled him to discredit her. Our review of the alleged *Brady* materials leads us to answer in the negative.

#### 1

On April 13, 1989, roughly six months after the jury returned its verdict, the government produced rough notes taken by Agent Abrahamson (1) during a personal interview with Sharon Smith and Steve Danzig on June 19, 1985; (2) after a telephone conversation and brief meeting with Smith two days later; and (3) during an interview with Smith on July 18, 1985.

Marashi claims that Agent Abrahamson's June 21 notes contain *Brady* material. Specifically, he claims that pretrial disclosure of one sentence—"[Smith] stated that the patient record cards is [sic] the only document that contains all the financial information."—would have enabled him to discredit Smith by showing that she knew of a source of financial records other than the missing black ledgers and stenographer's notebook.

We disagree. Well before trial, the government provided Marashi the transcript of Smith's July 18, 1985 statement to the IRS which contained a reference to patient ledger cards virtually identical to that in Agent Abrahamson's notes. In this light, the notes contained merely cumulative impeachment evidence and thus are not *Brady* material. *See Kennedy*, 890 F.2d at 1061 (citing *United States v. Polizzi*, 801 F.2d 1543, 1553 (9th Cir.1986); *United States v. Van Brandy*, 726 F.2d

548, 551 (9th Cir.), *cert. denied,* 469 U.S. 839, 105 S.Ct. 139, 83 L.Ed.2d 79 (1984)).

### 2

■ On March 31, 1989, the government produced Agent Houghton's notes of an interview with Steve Danzig on July 20, 1985. Marashi claims these notes contain valuable impeachment material. Specifically, he refers to Special Agent Houghton's cryptic notation regarding Sharon Smith's and Earl Doering's "break-in" of Marashi's office in August, 1984, *see generally supra* Part I.A. The notation reads: "[Danzig stated] '84 office occurrence never went with, would have reason to." Marashi interprets this note to mean that Danzig had *no* reason to accompany Smith to the break-in and thus serves to discredit Smith's trial testimony that Danzig knew about it.

We reject Marashi's interpretation. The note contains no indication that Danzig was either ignorant of the break-in or disinclined to go himself. Because this note has no impeachment or exculpatory value, it is not *Brady* material.[12]

### 3

■ On March 31, 1989, the government produced Agent Houghton's rough notes of his July 20, 1985 interview with Earl Doering, who accompanied Smith during the 1984 office break-in. Marashi's argument rests on one sentence in Agent Houghton's notes: "No locksmiths used." He claims this sentence is *Brady* material because it contradicts Smith's deposition testimony that she had used a locksmith to enter Marashi's office in August, 1984.

This argument is flawed in two respects. First, it misconstrues Smith's deposition testimony. Although Smith stated at one point that she had used a locksmith to open Marashi's office door, she later corrected

herself. She said that she had had the key to the office and had needed the locksmith only to open Marashi's desk. This correction is consistent with Doering's statement to Agent Houghton that no locksmiths were used to enter Marashi's office.

Second, to the extent that Agent Houghton's notes contain a contradiction of Smith's deposition testimony, they are cumulative. Smith's trial testimony itself contradicted Smith's initial (uncorrected) statement in her deposition. Thus, Marashi had ample opportunity to attempt impeachment on the locksmith issue. Because Agent Houghton's notes contained at best only cumulative impeachment evidence, they are not *Brady* material. *See Kennedy,* 890 F.2d at 1061.

### B

■ Marashi's second *Brady* claim refers to an entry in Special Agent Houghton's notes of the July 20, 1985 Danzig interview, which names Jerry McGougan, one of several private detectives Steve Danzig had hired to spy on Marashi and Sherrie Danzig. Marashi claims that the government's failure to turn over this information prejudiced him by preventing him from interviewing McGougan to determine whether he had helped either Smith or Danzig to steal and destroy the infamous black ledgers.

This argument rests on the untenable assumption that Marashi could not have obtained McGougan's identity of this detective from Danzig himself. Marashi knew well before trial that Danzig had hired several private detectives to spy on his unfaithful wife and Marashi in connection with his divorce proceedings.[13] He offers no reason why he could not have subpoenaed Danzig to learn more about the detectives. His failure to do so belies his bald assertion that knowledge of McGougan's

---

**12.** Moreover, because Marashi acknowledged that he had kept his black ledgers at home, it is difficult to imagine how the office break-in is material to his guilt or innocence. Marashi's *Brady* claim in *infra* Part III.A.3. suffers from the same defect.

**13.** This information was contained in the Marashi's copy of the transcript of Sharon Marashi's sworn statement to the IRS on July 18, 1985. Moreover, at the pretrial conference on July 22, 1988, over three months before trial, Smith again testified that Danzig had hired private investigators. Marashi did not cross-examine Smith on this point.

identity would have materially affected his preparation for trial. *See Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384 (failure to demonstrate adverse effect of nondisclosure upon trial preparation suggests lack of *Brady* materiality). Thus we conclude that it is not reasonably probable that disclosure of Agent Houghton's notes would have altered the jury's verdict. In other words, the notes are not *Brady* material. *See Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383–84.

### C

■ Marashi's remaining *Brady* claim is that the government committed error by failing to record all but two of its interviews with Sharon Smith.[14] In other words, Marashi claims the government had a constitutional obligation to compile *Brady* material.

We flatly rejected this theory in *United States v. Bernard*, 625 F.2d 854 (9th Cir. 1980). In that case, Agent Fredericks of the Drug Enforcement Agency had deliberately decided not to take notes of a series of interviews with one Richard May, a paid drug informant. Fredericks candidly stated that his purpose in doing so was to avoid leaving a paper trail of inconsistent factual remarks which the defense could use to impeach May. *Id.* at 859. The defendant argued, inter alia, that this practice ran afoul of *Brady*. Although we sharply criticized this practice, we nonetheless concluded that failure to record government interviews does not constitute *Brady* error. *Id.* at 860.

The two decisions upon which Marashi relies, *United States v. Harris*, 543 F.2d 1247 (9th Cir.1976); *United States v. Shields*, 571 F.2d 1115 (9th Cir.1978), pertain only to the destruction of *existing* government materials and thus are inapposite.

Accordingly, we conclude that by correctly applying *Brady*, the district court did not abuse its broad discretion in denying Marashi's motion for a new trial.

14. Smith testified that she had spoken with the IRS on 6–8 occasions. The IRS tape-recorded

### IV

■ Marashi's next claim, that the district court abused its discretion by admitting certain "bad acts" evidence, requires further factual explication.

Marashi kept two sets of appointment books in his office. The books (1) listed patient appointments, (2) described each patient's insurance carrier (if any), and (3) listed any payments received for that visit. Marashi directed that the entries be made in pencil.

During the fall of 1981, IRS Agent Jim Reavis audited Marashi's corporate income tax return for the fiscal year ending September 30, 1980 and his personal income tax returns for 1979–80. Count V of the indictment in this case refers to the fiscal year beginning October 1, 1980.

In 1985, Smith told the IRS that weeks before the IRS audit, Marashi had directed her and his then-secretary (and then-mistress), Marya LaSalandra, to erase entries in the appointment books which covered the audit period. The IRS then contacted LaSalandra. She stated that Marashi had indeed ordered her and Smith to make such erasures. However, her recollection was that Marashi's motive had been to conceal the number of his public assistance patients from Washington's Department of Social and Health Services (DSHS), which had also conducted an audit around that time. In a later interview, when asked if she remembered IRS Agent Reavis, LaSalandra recalled that the erasures had actually been made to hide income information from the IRS, not public aid information from the DSHS. She so testified at trial.

As time passed, Smith's recollection of the events also changed. Shortly before and during the trial she testified that Marashi's sole motive had been to conceal the number of his public aid patients from DSHS. She acknowledged, however, that some income information had been erased.

interviews on January 16 and July 18, 1985.

Marashi claims that because he was not indicted for tax evasion for the years of Agent Reavis' audit, the government introduced the evidence solely to demonstrate bad character and criminal disposition, in violation of Federal Rule of Evidence 404(b).[15] The district court overruled his objection on the basis that the erasures were admissible to prove intent.

We review the admission of bad acts evidence under Rule 404(b) for a clear abuse of discretion. *See United States v. Miller*, 874 F.2d 1255, 1268 (9th Cir.1989). Bad acts evidence may be admitted for purposes other than bad character so long as it meets the following criteria: (1) The conduct must be admitted to prove an element of the charged offense that is a material issue; (2) in some cases (*e.g.*, where establishing *modus operandi*) the conduct must be similar to the offense charged; (3) the evidence must be sufficient to support a jury finding that the defendant committed the bad act; and (4) the prior act must not be too remote in time from the commission of the crime charged. *Id.*

The government satisfied these prerequisites under Rule 404(b). First, the government introduced the evidence for the purpose of establishing *modus operandi*[16] and, ultimately, Marashi's intent to underreport his medical income. Second, the conduct is strikingly similar to the double-ledger scheme: Marashi kept a double set of appointment books and had his wife erase income information from the official copy. Third, the testimony of Marya LaSalandra and Sharon Smith, although conflicting in some parts, could support a jury finding that the erasures occurred. Fourth, the erasures occurred in July 1981, when the double-ledger scheme alleged in the indictment was already in effect.

## V

Marashi next argues that the evidence was insufficient to support his convictions.

In evaluating such a claim, we must review the evidence in the light most favorable to the prosecution to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Adler*, 879 F.2d 491, 495 (9th Cir.1988).

## A

Marashi first contends that because he did not take as many deductions as he could have for the years 1981–83, his tax deficiency was not substantial enough to warrant a conviction under 26 U.S.C. § 7201.

This argument lacks merit. The language of § 7201 does not contain a substantiality requirement. It simply states that willful attempts to evade "any tax" under the Tax Code is a felony. Likewise, § 7201's predecessor, 26 U.S.C. § 145(b) (1939), imposed no minimum amount. We have long held that "[c]onviction under section 7201 requires proof beyond a reasonable doubt of each of the following elements: (1) the existence of a tax deficiency; (2) willfulness; and (3) an affirmative act constituting an evasion or attempted evasion of the tax." *United States v. Conforte*, 624 F.2d 869, 873 (9th Cir.) (emphasis added), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980); *see also United States v. Buckner*, 610 F.2d 570, 573 (9th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1646, 64 L.Ed.2d 235 (1980).

Indeed, in *Marks v. United States*, 391 F.2d 210, 211–12 & n. 1 (9th Cir.), *cert. denied*, 393 U.S. 839, 89 S.Ct. 116, 21 L.Ed.2d 109 (1968), we rejected the same sort of *de minimis* argument Marashi makes here. We affirmed a § 7201 conviction for a deficiency of $375.49 and noted that "[t]he light sentence imposed reflects the trial court's conclusion that a small

---

**15.** Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or absence of mistake or accident.

**16.** In particular, the erasures evidence further supports the government's theory that Marashi enlisted Smith's services to falsify tax records.

time wrongdoer, but nonetheless a wrongdoer, was caught and properly convicted." *Id.* at 212.

Thus, we must reverse Marashi's convictions only if no rational trier of fact could have found *some* tax deficiency beyond a reasonable doubt. Marashi does not seriously claim that that is the case. He simply points to expert testimony that if he had taken advantages of all the deductions available to him for 1981–83, he "would seriously reduced his taxes due or possibly even eliminated them completely." The latter suggestion is hardly sufficient to overcome the evidence of deficiencies particularly when we must view it in the light most favorable to the government. Accordingly, Marashi's § 7201 convictions must stand.

**B**

 Marashi next seeks reversal of his § 7206(1) conviction for subscribing to a false tax return because available deductions would have left him with no tax deficiency.

This argument also lacks merit. Section 7206(1) is a perjury statute; it is irrelevant whether there was an actual tax deficiency. *See United States v. Marabelles,* 724 F.2d 1374, 1380 (9th Cir.1984) (citing *United States v. Brooksby,* 668 F.2d 1102, 1103–04 (9th Cir.1982)); *United States v. Miller,* 545 F.2d 1204, 1211 n. 8 (9th Cir.1976) (citing numerous cases), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977). "A violation of 26 U.S.C. § 7206(1) is complete when a taxpayer files a return 'which he does not believe to be true and correct as to every material matter.'" *Miller,* 545 F.2d at 1212 n. 10 (quoting *United States v. Bishop,* 412 U.S. 346, 350, 93 S.Ct. 2008, 2012, 36 L.Ed.2d 941 (1973)); *accord United States v. Greer,* 607 F.2d 1251, 1252 (9th Cir.), *cert. denied,* 444 U.S. 993, 100 S.Ct. 526, 62 L.Ed.2d 423 (1979). Naturally, the amount of gross corporate receipts is a material item on a corporate tax return. Because Marashi unquestionably signed his 1981 corporate tax return in the knowledge that the amount of gross receipts was false, his § 7206(1) conviction must stand.

**VI**

For these reasons, the judgment of the district court is AFFIRMED.