76 F.3d 389
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donnell JOSEPH, Defendant-Appellant.
 No. 95-50027.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 9, 1996.
Decided Jan. 31, 1996.
 
 Before: BRIGHT*, SKOPIL, and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Donnell Joseph appeals his conviction for robbing a postal service letter carrier in violation of 18 U.S.C. § 2114. He contends that the district court erred in refusing to allow him to substitute appointed counsel or to proceed pro se. Joseph also claims that the district court erred by refusing to appoint a gang expert or to permit his sister to testify as a gang expert. Finally, he claims that the district court erred in denying his motion for a new trial because the government failed to disclose Brady material. We reject these contentions and thus affirm.
 
 1. Representation
 
 3
 The district court did not abuse its discretion in denying Joseph's motion to substitute counsel. We have "consistently held that a district court has broad discretion to deny a motion for substitution made on the eve of trial if the substitution would require a continuance." United States v. Garcia, 924 F.2d 925, 926 (9th Cir.), cert. denied, 501 U.S. 1210 (1991).
 
 
 4
 The district court did not commit reversible error when it denied Joseph's request to represent himself. Joseph failed to make an unequivocal demand to proceed pro se. See Jackson v. Ylst, 921 F.2d 882, 888-89 (9th Cir.1990).
 
 2. Gang Experts
 
 5
 The district court did not abuse its discretion in denying Joseph's request to appoint a gang expert. Reasonably competent counsel would not have required a gang expert in this case. See Bonin v. Calderon, 59 F.3d 815, 837 (9th Cir.1995), cert. denied, --- S.Ct. ---- (Jan. 8, 1996). Moreover, Joseph has failed to show by clear and convincing evidence that appointment of the expert would have resulted in an acquittal. See id.
 
 
 6
 There was also no error in the court's refusal to allow Joseph's sister to testify as an expert. The only foundation elicited for her testimony was that she lived in "gang territory," had family members who used to be in gangs, and was "familiar with [the neighborhood gangs'] behavior and their attitudes and what they do." The district court did not abuse its discretion in ruling that this foundation was inadequate.
 
 3. New Trial--Brady Violation
 
 7
 Joseph argues that the government should have disclosed a memorandum of an interview with another defendant charged with robbery who claimed, like Joseph, that he was forced to commit the crime by a particular drug dealer. We reject this contention.
 
 
 8
 The government must disclose evidence only if it is material to either guilt or punishment. See United States v. Marashi, 913 F.2d 724, 732 (9th Cir.1990). Viewing the memorandum as a whole, we conclude that it is not material. The memorandum includes inculpatory evidence. See United States v. Kennedy, 890 F.2d 1056, 1060 (9th Cir.1989), cert. denied, 494 U.S. 1008 (1990). In particular, it includes a statement that Joseph allegedly "joked about how he would tell the prosecutors that he was forced into doing [the] robbery." Therefore, had the memorandum been disclosed, there is no reasonable possibility that the outcome of the trial would have been different. Marashi, 913 F.2d at 732. Because we conclude that there was no Brady violation, we also conclude that the district court did not abuse its discretion in denying Joseph's motion for a new trial.
 
 
 9
 AFFIRMED.
 
 
 10
 BRIGHT, Circuit Judge, dissenting.
 
 
 11
 The defendant Joseph is going to serve more than twenty-two years in jail for a postal robbery which he claims a "gang" leader forced him to commit. Essentially, Joseph claims that he has been tried unfairly because the district court:
 
 
 12
 1. Refused Joseph a change of counsel or a right to represent himself;
 
 
 13
 2. Denied his request for a "gang" expert to testify;
 
 
 14
 3. Denied testimony of a lay witness (defendant's sister) that gang leaders often coerce older gang members or persons who owe them drug debts to commit crimes, and finally;
 
 
 15
 4. Denied a new trial on the prosecution's Brady[1] violation in failing to disclose to Joseph's counsel that another drug debtor had been forced by the same gang leader to commit postal carrier robbery crimes similar to that in Joseph's case.
 
 
 16
 I agree that items 1, 2, and 3 above do not require a reversal.
 
 
 17
 I must respectfully disagree with the majority on the Brady violations and would reverse and remand for consideration of a new trial.
 
 
 18
 At this trial on the robbery offense (the second for Joseph as the first jury could not agree), Joseph testified that one Paul Gray, a gang leader, whom Joseph owed money for drugs furnished by Gray, forced Joseph to commit the robbery. Gray picked Joseph up in his car and sent Joseph out three or four times to rob mail carriers. Joseph left the car but returned with no proceeds, making up excuses for Gray. The next time, Gray pulled a gun and threatened he would blow Joseph's brains out if Joseph did not rob the next mailman. So Joseph claimed he did what Gray told him to do.
 
 
 19
 The Joseph robbery occurred on September 1, 1993; the prosecutor had information relating to two postal carrier robberies committed by Manual Calvin, Jr. on September 15, 1993.
 
 
 20
 Calvin gave postal inspectors a statement that "Little Bean" (Paul Gray), another accomplice and Yolanda Jones (also present with Gray at Joseph's alleged coercion) forced Calvin at gunpoint to rob a mailman. Little Bean (Gray) induced Calvin to get in the car with an offer of money.
 
 
 21
 The statement offered by the prosecutor then included the following:
 
 
 22
 7. While they were driving, "Little Bean" told [Calvin] he was going to earn the money by robbing a mailman. "Little Bean" had two guns. He handed a .45 semiautomatic to Calvin. The gun was not loaded. Calvin told "Little Bean" and "Potato Head" [Lawrence Pearson] he didn't want to rob a mailman. "Little Bean" pulled his other gun, pointed it at Calvin, and told him he was going to rob the mailman.
 
 
 23
 8. They went to the vicinity of 60th and Denker. "Little Bean" and "Potato Head" had already spotted a letter carrier and knew that he was in the area. "Potato Head" got out and looked around for the carrier, while "Little Bean" pulled the car into an alley. Once "Potato Head" spotted the letter, he stayed out on the street until Calvin completed the robbery. When Calvin got the letter carrier's mail bag and returned to the alley, "Little Bean" asked for the mail bag. The three of them drove through the alley and continued driving around until they got to an alley in the vicinity of 62nd, between Hobart and Harvard Streets. Calvin added that on the way over there, "Little Bean" had him lie down on the back seat so he would not be observed.
 
 
 24
 ....
 
 
 25
 21. I then asked [Calvin] if he was familiar with an individual by the name of Homer Wallace who was in custody at the MDC. He stated he was familiar with this individual by his street name, "Kool Aid." He stated he had known "Kool Aid" for approximately 18 months. He stated "Kool Aid" was a drug addict.
 
 
 26
 22. It was decided to contact Assistant United States Attorney Daniel Collins and offer him an opportunity to sit in on the next portion of the interview dealing with Homer Wallace, whose true name is Joseph Donnell.
 
 
 27
 23. Calvin stated that he had conversations with Homer Wallace at the Metropolitan Detention Center. Specifically, Wallace told him that "Little Bean" had picked him up on September 1, 1993, and they, along with Yolanda Jones, were going to rob a letter carrier, probably in the "20's." According to Wallace, the letter carrier they ended up robbing was only a block away from Yolanda's mother's house. He stated that Wallace told him he didn't use a gun, he used a knife. He stated that after the robbery, the letter carrier came after them. He passed the satchel on to the girl (Jones) who in turn passed it on to "Little Bean." He turned around and threw the knife at the letter carrier. He threw the knife at the letter carrier because he was afraid of getting caught and he wanted to get away. He has since joked about how he would tell the prosecutors that he was forced into doing that robbery.
 
 
 28
 24. He also told Calvin that he had done an earlier robbery with "Little Bean" at Gage and Western. He didn't provide any real details other than to say that they had pulled up and seen the carrier just leaving a glass shop at the particular intersection. They robbed him just after that.
 
 
 29
 25. Wallace further told Calvin that "Yo-Yo's" sisters were involved in cashing checks. These sisters were "Nee-Nee" and "Tippy." Additionally, "Little Bean," "Potato Head," and Wallace, along with two others had "done" an armed robbery of a bank in the San Diego area, sometime during 1993. They obtained $7-8,000 from this bank robbery. Wallace told Calvin that he better keep quiet about the people he worked with.
 
 
 30
 Clerk's Record at 149, 151-52.
 
 
 31
 The prosecutor did not turn this information over to Joseph but filed a copy of the statement in camera with the trial court with a memorandum of law setting forth why this was not Brady material. The court of course never responded as the court had no obligation to do anything with this ex parte information.
 
 
 32
 In my view the prosecutor improperly made ex parte representations to the district court relating to Brady material. That material would be helpful to the defense. The prosecutor submitted a memorandum of law to the court but Joseph's appointed counsel had no knowledge or opportunity to reply or ask the trial court for relief. Shortly after filing the in camera materials and memorandum, the prosecutor moved in limine to exclude Joseph's duress defense at trial even though he knew some corroborating evidence existed. This dissenting judge considers that conduct by the prosecutor improper and unfair.
 
 
 33
 In my view the statement in question contains Brady material and would be helpful to the defense.
 
 
 34
 The paragraphs 21-25 in the statement, which served to indicate Joseph made damaging admissions to Calvin, provides no excuse for the prosecutor's refusal to turn over to Joseph information helpful to his defense. After all, that unfavorable information might be shown to be simply Calvin's effort to "make a deal" and curry favor with the prosecutor.
 
 
 35
 The district court summarily denied the motion for a new trial. I believe the evidence by Calvin is exculpatory in part since it supplants the defendant's claim that "Little Bean" engaged in continuing gang activity, forcing others to rob postal employees. Whether the evidence would give rise to a reasonable probability of a different result depends on the credibility of the other inculpatory evidence regarding Joseph provided by Calvin. These matters should be evaluated after a hearing on the motion for new trial as suggested by Joseph's counsel.
 
 
 36
 Accordingly, I would remand for a hearing on a new trial relating to the prosecutor's conduct in withholding favorable evidence for Joseph. See Brady, 373 U.S. 83, 87-91 (1963); United States v. Zuno-Arce, 44 F.3d 1420, 1425 (9th Cir.1995). Joseph has been sentenced as a career criminal with a long criminal record. He maintains his innocence in this case. Regardless of prior crimes, he is entitled to a fair trial.
 
 
 
 *
 The Honorable Myron H. Bright, Senior United States Circuit Judge, Eighth Circuit Court of Appeals, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Brady v. Maryland, 373 U.S. 83 (1963)