97 F.3d 1462
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael Bruce MARKS, also known as Robert Bush, Grant Young
and Douglas Hansen, Defendant-Appellant.
 No. 95-50290.
 United States Court of Appeals, Ninth Circuit.
 Submitted Sept. 18, 1996.*
Decided Sept. 23, 1996.
 
 1
 Before: KOZINSKI and LEAVY, Circuit Judges, and SCHWARZER,** District Judge.
 
 
 2
 MEMORANDUM***
 
 
 3
 Michael Marks timely appeals his jury conviction on eight counts of wire fraud, in violation of 18 U.S.C. § 1343. He asserts that the district court erred in denying his motion to dismiss the indictment or to suppress the testimony of three government witnesses. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.
 
 FACTS AND PRIOR PROCEEDINGS
 
 4
 Marks was the head of Transworld Agency (TWA) an entity that purported to be an overseas job placement agency. Beginning in September 1991, TWA advertised its overseas job placement services. The advertisements promised, "Employment guaranteed or full refund of advance fee."
 
 
 5
 When job applicants contacted TWA, salespersons told them that TWA would endeavor for six months to find overseas jobs for them in exchange for an advance payment of between $795 and $1,200. TWA guaranteed a full refund of the advance payment if TWA had not found a job for the client within the six month period. However, once TWA had taken the advance fees, TWA made no efforts to find jobs for the clients, and, in fact, did not place any client in any job. In March 1992, TWA closed without refunding $1.6 million of advance fees to 2000 job seekers.
 
 
 6
 In October 1994, Marks was arrested and indicted on eight counts of wire fraud in violation of 18 U.S.C. § 1343 in connection with his role at TWA. On November 7, 1994, FBI Special Agent Patrick Conley, the FBI case agent assigned to Marks, was contacted by Marks' family and told that Marks had information regarding a possible conspiracy to obstruct justice. Conley met with Marks' counsel at the Metropolitan Detention Center (MDC) where Marks was incarcerated pending trial. At that meeting Marks' counsel told Conley that another inmate at MDC, William Fisher, had told Marks that he knew three people who were involved in TWA: Jean Birch, Ron Lavalle, and Katherine Warner (Ron Lavalle's former wife). According to Fisher, Birch, Warner, and Lavalle were willing to alter their testimony at trial in Marks' favor in exchange for $250,000. Fisher also had told Marks that Warner was unreliable and that Fisher, or Birch and Lavalle would kill Warner.
 
 
 7
 Marks' counsel told the FBI that Marks wanted the FBI to set up a "sting" operation to catch Birch, Lavalle, and Warner. Counsel also told the FBI agents that he personally believed that "such an obvious conspiracy doesn't seem plausible," that Marks has a "tendency to embellish the truth," and that counsel was concerned about passing misleading information on to the FBI.
 
 
 8
 Conley met with the Assistant United States Attorney (AUSA) who was Chief of the Major Crimes Section of the Office of the United States Attorney. The AUSA advised Conley that another FBI agent should be assigned to investigate the bribery allegations, to avoid a conflict with Agent Conley's investigation of Marks. The AUSA further advised Conley to tell Warner of the possible threat to her life. Conley also understood FBI policy to require such notification.
 
 
 9
 Conley asked Special Agent Enyeart to inform Warner of the threat, but not its source. Enyeart did so on November 10, 1994. Five days later Warner telephoned Conley, with whom Warner had been in contact in connection with the FBI's investigation of TWA. Warner said she was contacting Conley because of her concern about the threat to her life. Conley asked her when she had last had contact with the other individuals from TWA. Warner stated that she last had contact with Birch the previous summer and that she had sought a restraining order to prevent Lavalle (her former husband) from contacting her. Based on these statements, Conley concluded that Warner was not part of any conspiracy to take money in exchange for altered testimony and told her the nature and source of the alleged threat to her life.
 
 
 10
 FBI Special Agent Varley, who had investigated obstruction of justice cases for fifteen years, was asked to investigate the allegations of bribery. Varley conducted this investigation as he would have conducted any other under the circumstances. Varley went to MDC and reviewed tape recordings of the phone calls from Fisher to Birch. Varley interviewed Fisher, who had been released from MDC. Fisher admitted putting Marks in touch with Birch but denied being involved in a conspiracy to solicit money in exchange for false testimony. Varley returned to MDC to listen to tape recordings of additional phone conversations identified by Fisher. Varley did not hear any discussion in these phone conversations of a threat to Warner's life.
 
 
 11
 Varley interviewed Birch who admitted involvement in the solicitation of bribes from Marks. Birch claimed that she had planned to testify truthfully once she got the money from Marks and denied any plans to kill Warner.
 
 
 12
 Varley concluded that Marks had been solicited by Fisher and Birch to pay money, supposedly in exchange for altered testimony, but that Birch and Fisher were attempting to defraud Marks and did not intend to do anything more than pocket the money. Varley recommended to the AUSA that prosecution of Fisher and Birch be declined. The AUSA concurred in the recommendation and did not prosecute any individuals in connection with the alleged obstruction of justice.
 
 
 13
 In advance of trial, the government provided Marks with all the evidence obtained in the course of the obstruction investigation (including tapes of the telephone calls, a log of those called, reports of interviews, and summary correspondence).
 
 
 14
 On February 13, 1995, Marks filed a pre-trial motion seeking dismissal of the indictment for governmental misconduct or, alternatively, to exclude the trial testimony of Birch, Lavalle, and Warner. The basis for this motion was Marks' assertion that, after his counsel informed the FBI of the plot to obstruct justice, the FBI had conducted its investigation of the plot in a manner designed to protect the credibility of its witnesses, Birch, Warner, and Lavalle. Marks contended that the government had violated Brady v. Maryland, 373 U.S. 83 (1963), which requires the government to disclose exculpatory evidence to the defense, and California v. Trombetta, 467 U.S. 479 (1984) and Arizona v. Youngblood, 488 U.S. 51 (1988), which hold that the government's bad faith destruction of, or failure to preserve, potentially exculpatory evidence violates the Due Process Clause.
 
 
 15
 The district court denied the motion to dismiss, finding Brady inapplicable because Marks was not asserting that the government failed to disclose evidence it possessed but merely complaining of the government's failure to pursue its investigation in a manner that might have created impeachment material. The district court further ruled that Marks failed to show any bad faith on the part of the government during the investigation which might constitute a due process violation under Youngblood or Trombetta.
 
 
 16
 After trial, the jury returned verdicts of guilty on all eight counts and the district court sentenced Marks to 120 months imprisonment. Marks filed a timely notice of appeal. On appeal Marks contends that the district court erred in denying his motion to dismiss the indictment or to suppress the testimony of the three government witnesses.
 
 DISCUSSION
 
 17
 Marks' argument that the government's conduct of the investigation violated Brady fails for the reason given by the district court: the government's duty to disclose evidence favorable to the defense is triggered only when the government possesses the Brady material. See United States v. Marashi, 913 F.2d 724, 734 (9th Cir.1990) (rejecting assertion that "the government had a constitutional obligation to compile Brady material"). The government carried out the investigation according to established procedures and disclosed the results of its investigation to Marks, thereby providing him with substantial impeachment material. Marks is incorrect in asserting that the government was required to conduct a "sting" operation based on his claim that there was a conspiracy among Birch, Lavalle, and Warner to obstruct justice. Such a requirement would impose an unwarranted burden on the government to create or compile exculpatory evidence.
 
 
 18
 Moreover, there is no evidence that a more thorough investigation would have uncovered exculpatory material. Marks claims that Agent Conley prematurely tipped off Katherine Warner about the government's investigation, and that this hindered the collection of evidence against Warner and Ron Lavalle. This assertion hinges on the possibility that Warner, once warned about the investigation, passed this information on to the other alleged participants.
 
 
 19
 There is no evidence, however, that Warner ever agreed to participate in the conspiracy; Fisher's death threats against her are strong evidence to the contrary. Marks' claim is also belied by the fact that Warner had previously sought to sever her relationship with Lavalle by obtaining a restraining order against him. Given their history, it is highly unlikely that Warner would have passed any information to Lavalle.
 
 
 20
 Marks' claim is also belied by the fact that Jean Birch admitted to Agent Varley that she and Fisher never planned to secure Warner's cooperation, but instead intended to keep the bribe money for themselves. Having already confessed her participation in the conspiracy, Birch had no incentive to lie about Warner's participation; if anything, it would have helped her to name other co-conspirators. Given Birch's claim that she and Fisher intended to keep the bribe money, it is perfectly clear why the conspirators discussed the possibility of Warner and Lavalle's participation in their telephone calls with Marks; Marks was more likely to pay the bribe if he believed it would eliminate more adverse witnesses.
 
 
 21
 Marks' second argument, that the government violated his due process rights set forth in Trombetta and Youngblood by failing to preserve and/or collect exculpatory evidence also fails for the reason given by the district court--the government did not act in bad faith when conducting the investigation. The Due Process Clause does not require law enforcement to use a particular investigatory tool. See Youngblood, 488 U.S. at 58-59. To establish a due process violation for failure to preserve or collect evidence, a defendant bears the burden of showing the government's bad faith. People of Territory of Guam v. Muna, 999 F.2d 397, 400 (9th Cir.1993). We have not decided whether the appropriate standard to determine bad faith by law enforcement is objective or subjective. United States v. Westerdahl, 945 F.2d 1083, 1087 (9th Cir.1991). Under either standard, the evidence here supports the district court's finding that the government did not act in bad faith. The government conducted a thorough, independent investigation of Marks' allegations, following standard investigatory procedures. Compliance with regular practice is sufficient to rebut defendant's claim that the government acted in bad faith. See United States v. Barton, 995 F.2d 931, 935 (9th Cir.), cert. denied, 114 S.Ct. 413 (1993). Marks also offered no evidence that there was any subjective bad faith on the part of the government.
 
 CONCLUSION
 
 22
 Marks' conviction is AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 **
 The Honorable William W. Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3