120 F.3d 1028
 97 Cal. Daily Op. Serv. 6013, 97 Daily Journal
D.A.R. 9887
UNITED STATES of America, Plaintiff-Appellee,
v.
Julio Cesar RAMOS-OSEGUERA, aka Jesse; Sotero
Ramos-Oseguera, aka Placo; Maria De Lourdes Reyes-Sandoval,
aka Ana; Roberto Ramirez, aka Carlos Montoy, aka Prado;
Samuel Robles-Lopez, Defendants-Appellants.
 Nos. 95-10386, 95-10478, 95-10535, 95-10491 and 95-10498.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 10, 1996.
Decided July 30, 1997.
 
 Karen L. Landau, San Francisco, CA, for Defendant-Appellant Maria Reyes-Sandoval.
 Richard B. Mazer, San Francisco, CA, for Defendants-Appellants Julio Ramos-Oseguera and Sotero Ramos-Oseguera.
 Paul B. Meltzer, Rosemarie Braz, Law Offices of Paul B. Meltzer, Santa Cruz, CA, for Defendant-Appellant Roberto Ramirez.
 Vicki H. Young, Assistant Federal Public Defender, San Jose, CA, for Defendant-Appellant Samuel Robles-Lopez.
 Mary E. Pougiales, Assistant United States Attorney, Oakland, CA, for Plaintiff-Appellee.
 Appeal from the United States District Court for the Northern District of California; D. Lowell Jensen, District Judge, Presiding. D.C. No. CR-93-00326-DLJ.
 Before: BOOCHEVER, REINHARDT and RYMER, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 Julio Ramos-Oseguera (Ramos) and Sotero Ramos-Oseguera (Sotero) were convicted of a conspiracy to sell heroin in addition to many individual counts of heroin sales. Ramos was also convicted of Continuing Criminal Enterprise (CCE). At that same trial, Roberto Ramirez (Ramirez) was convicted of a single count of possession of heroin with intent to sell, and Samuel Robles-Lopez (Robles) was convicted of two counts of possessing and distributing heroin. Ramirez and Robles were both acquitted of the conspiracy charge.
 
 
 2
 Prior to the Ramos trial, Ramos's wife, Maria Reyes-Sandoval (Reyes), was tried separately. She raised a duress defense, asserting that Ramos had physically and psychologically abused her and forced her to participate in the heroin distribution. She admitted many acts and was acquitted of conspiracy but convicted of several individual counts of heroin distribution. Her appeal has been consolidated with those of the other appellants.
 
 BACKGROUND
 A. The Heroin Organization
 
 3
 Appellants Ramos, Sotero, Ramirez, and Robles pleaded not guilty to multiple heroin distribution offenses and carrying firearms in relation to a drug trafficking crime. Ramos also pleaded not guilty to conducting a Continuing Criminal Enterprise. The four were tried together ("the Ramos trial"), and they were convicted and sentenced as follows:
 
 
 4
 Ramos was convicted of conspiracy to possess heroin with intent to distribute in violation of 21 U.S.C. § 846; continuing criminal enterprise in violation of 21 U.S.C. § 848; twenty counts of possession with intent to distribute and distribution of heroin in violation of 21 U.S.C. § 841(a)(1); six counts of use of a telephone to further a drug transaction; and two counts of use of a minor to further a drug transaction. Ramos was sentenced to 35 years in prison.
 
 
 5
 Sotero was convicted of the conspiracy count; five counts of possession of heroin with intent to distribute; and four counts of unlawful possession of a firearm by an illegal alien in violation of 18 U.S.C. § 922(g)(5). Sotero was sentenced to 25 years.
 
 
 6
 Ramirez was convicted of one count of possession of heroin with intent to distribute and sentenced to 63 months.
 
 
 7
 Robles was convicted of two counts of possession of heroin with intent to distribute and one count of unlawful possession of a firearm by an illegal alien. He was sentenced to nine years.
 
 
 8
 During the seven-week Ramos trial, the following evidence was received:
 
 
 9
 Two informants, Barry Goldstein and Robert Munda, testified that they were long-term customers of the Ramos organization (all of whom they knew under aliases). Undercover agents worked with Goldstein and Munda to complete several heroin buys from several people within the organization. Those agents testified at trial as well. Police officers and federal agents testified regarding surveillances of various Ramos homes. Approximately 50 tape recorded telephone conversations of Ramos, Sotero, Reyes and others taking heroin orders and organizing the deliveries were introduced. Telephone records showed almost 100,000 calls to and from the Ramos residence and cell phones in three years. Photos showing trafficking activity were introduced, as were thirteen semi-automatic pistols. The government also entered, over the defendants' objection, transcripts of testimony offered by Reyes at her separate trial. That testimony indicated that there was a major heroin distribution organization that spanned many years and involved many people (mostly Ramos family members), and may have implicated Ramos as the leader. The distribution was run out of several homes and used multiple vehicles in order to avoid detection. The government estimates that the organization generated millions of dollars from sales of many kilograms a year of black tar heroin.
 
 
 10
 Further background to the issues appealed by the Ramos-trial defendants is provided, infra, in the relevant subsections.
 
 B. The Reyes Trial
 
 11
 Reyes and Ramos met when they were 14 and 21 respectively. Before Reyes was 18 the two were living together and had had a daughter. When they met, Ramos was present in the United States illegally, but he ultimately obtained a green card. Ramos had distributed heroin since before the beginning of his relationship with Reyes, and Reyes admits that when she moved into his house, she also became involved in heroin distribution.
 
 
 12
 Reyes is fluent in both Spanish and English. As one of the only English speakers in the heroin organization, she handled almost all of the communications. When a customer would call, she would translate the order into Spanish for Ramos or another male organization leader (usually Sotero) who then decided issues of quantity, price, and meeting place. Reyes translated the instructions back into English for the customer. On occasions when neither Ramos nor Sotero were available, Reyes would make the logistical arrangements herself, including dispatching runners to meeting places. Reyes did not, however, have price-negotiating authority. One undercover agent, Raul Cano, testified that he spoke with Reyes (operating under the alias "Ana"), but that as a new customer he had to call back several times because Ramos was not at home.
 
 
 13
 Reyes admitted translating heroin orders and dispatching runners to consummate individual heroin sales. She claimed, however, that she participated in the narcotic sales under duress. At trial, Reyes testified that Ramos had battered her since the time they first began living together. He beat her with his hands, belts, and sandals, once burned her with a cigarette lighter leaving a scar, and frequently held loaded guns to her head, including when she was eight months pregnant. She further testified that he verbally abused her, threatened to kill her, and threatened to take their daughter away to Mexico.
 
 
 14
 Reyes and Ramos lived together with several of his family members, most of whom were involved in heroin distribution. Reyes was seldom alone in the house, and was almost never permitted to leave the house unescorted. Ramos often checked up on her whereabouts. Reyes had access to one bank account that at any given time contained a maximum of $2500, but she testified that she did not have access to Ramos's money. Reyes visited her family infrequently and always accompanied by one of Ramos's relatives. She testified that Ramos once struck her in front of her brother, Jose Luis. She asked Jose Luis, also a participant in the heroin ring, to drive her to her parents' home, but he refused because he was afraid of Ramos and did not want to get involved.
 
 
 15
 Ramos was frequently away from home, often out of the country. Reyes testified that when he was away, his family members, led by Sotero, controlled the heroin business and watched over her. She claims that Ramos compelled her to participate in the family heroin business by force. She did not believe that anyone, including her family, would help her, and she feared that if she did not do what he wanted he would kidnap their daughter and return to Mexico where he still had considerable family. Reyes also testified that she loved Ramos, that he was proud of her when she helped with the heroin distribution, and that she enjoyed making him proud. She believed that eventually he would realize how much he loved her and stop beating her.
 
 
 16
 The district court permitted testimony and argument regarding Reyes's history of abuse at the hands of Ramos and its effects regarding her duress defense. A psychologist testified at trial that Reyes exhibited traits consistent with the effects of battering, but all of the testimony identifying actual incidents of abuse came from Reyes herself. Reyes called her brother Jose Luis to corroborate her testimony regarding the abuse, but he claimed his Fifth Amendment privilege against incriminating himself and refused to testify. When the government did not grant him use immunity for his testimony, Reyes moved for a mistrial, and the district court denied the motion.
 
 
 17
 At the close of presentation of evidence, Reyes requested a duress instruction that specifically explained how the battering evidence tied in. The government objected that the instruction was argumentative, and the district court denied the request. The court did, however, give a general duress instruction. During deliberations, the jury requested the following two clarifications regarding the duress instruction: Should an "immediate threat" be measured by an objective or subjective point of view; and should the jury consider the duress defense in a holistic or count by count manner? The court answered that the defense should be considered objectively and count by count.
 
 
 18
 Reyes's jury acquitted her of conspiracy and of several other counts. It convicted her of five distribution counts and nine phone counts relating to the same five instances of distribution. Before sentencing, Reyes's attorney gave the court letters from four jurors that urged leniency and explained that they believed that Reyes had been battered by Ramos, but that his coercion of her did not satisfy the legal definition of perfect duress. The court accepted the letters, but concluded that the policy behind preventing lawyers from interviewing jurors after a verdict likewise cautioned against his considering the letters.
 
 
 19
 At sentencing, the court departed upward two levels because Reyes played an organizing or manager role in the heroin distribution. When the defense argued for downward departures based on youthful lack of guidance, imperfect duress, and battered woman syndrome as a form of diminished capacity, the court held that because all three stemmed from Reyes's relationship with Ramos, they were all essentially the same thing. It therefore did not make findings regarding whether departures could be made for the latter two and instead departed downward two levels for youthful lack of guidance. The district court also refused to depart downward for acceptance of responsibility, and sentenced Reyes to 97 months, the maximum of the 78--97 month range for offense level 28 and criminal history category I.
 
 DISCUSSION
 I. The Ramos Trial
 
 20
 A. Admissibility of Reyes's Trial Transcripts
 
 
 21
 Appellants contend that Reyes's trial transcripts were improperly admitted at the Ramos trial. The transcripts are out-of-court statements introduced to prove the truth of the matter asserted. As such they are hearsay. A district court's decision to admit evidence under exceptions to the hearsay rule is reviewed for an abuse of discretion. United States v. Gilbert, 57 F.3d 709, 711 (9th Cir.1995) (per curiam).
 
 
 22
 The district court admitted portions of Reyes's trial transcripts under Federal Rule of Evidence 804(b)(3), which permits statements that would otherwise constitute hearsay when the declarant is unavailable as a witness and the statements "so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."
 
 
 23
 Because Reyes properly claimed the spousal testimonial privilege not to testify against her husband Ramos, she was unavailable as a witness under Rule 804(a)(1).[1] Even if the district court's holding that Reyes did not have the testimonial privilege had been correct, then she would have been unavailable under 804(a)(2) as someone who "persists in refusing to testify ... despite an order of the court to do so."
 
 
 24
 We need not decide, however, whether the district court abused its discretion in admitting Reyes's statements because any error was harmless. Her testimony was insignificant when compared to the government's entire case against the Ramos trial defendants. The defendants faced testimony from informants and undercover agents; evidence of telephone activity, recorded telephone calls, runners, runner cars, and runner apartments. In view of this overwhelming evidence, the small number of statements by Reyes that may not have been primarily inculpatory did not affect the Ramos-trial defendants' substantial rights. See Fed.R.Evid. 103(a) ("[e]rror may not be predicated upon a ruling which admits ... evidence unless a substantial right of the party is affected").
 
 
 25
 Nor did the admission of Reyes's testimony violate the Confrontation Clause because Confrontation Clause violations are also subject to harmless error analysis. United States v. Vargas, 933 F.2d 701, 704-05 (9th Cir.1991) (as amended). For the reasons explained above, we hold that any error was harmless beyond a reasonable doubt. See Toolate v. Borg, 828 F.2d 571, 575 (9th Cir.1987) (Confrontation Clause violation requires reversal unless error harmless beyond a reasonable doubt).
 
 B. Variance from the Indictment
 
 26
 The jury instructions at the Ramos trial did not exactly track the conspiracy alleged in the indictment. The indictment alleged a conspiracy to distribute at least one kilogram of heroin between 1983 and June 1993. The jury was instructed differently-that the alleged conspiracy began in 1987 and that its object was to distribute an unspecified amount of heroin. A legally significant variance occurs, however, only when evidence presented at trial proves facts "materially different" from those alleged in the indictment. United States v. Olano, 62 F.3d 1180, 1194 (9th Cir.1995), cert. denied, --- U.S. ----, 117 S.Ct. 303, 136 L.Ed.2d 221 (1996). A variance as to a starting date does not constitute reversible error unless time is a material element of the charged offense. United States v. Laykin, 886 F.2d 1534, 1543 (9th Cir.1989) (requiring only that defendants had adequate notice of the charges against them). Moreover, the quantity of drugs is not an element of the offense. United States v. Sotelo-Rivera, 931 F.2d 1317, 1319 (9th Cir.1991). Appellants argue that the combination of these two variances, in addition to evidence elicited at trial that could have shown multiple smaller conspiracies, was sufficiently prejudicial that it affected their substantial rights.
 
 
 27
 The differences were not material but minor, and any potential confusion regarding multiple conspiracies was eliminated by the court's instruction that guilt could only be found for involvement in the single, large conspiracy alleged in the indictment.
 
 C. 18 U.S.C. § 924(c) Charges
 
 28
 The government charged the Ramos-trial defendants with six counts of using and carrying a firearm in connection with a drug trafficking offense, in violation of 18 U.S.C. § 924(c). The jury was told that the charges had been filed and it received preliminary instructions on the elements required to prove a violation of § 924(c). The government did not call the one witness, however, who could establish the § 924(c) violations, because it became apparent that the witness would invoke his Fifth Amendment right not to incriminate himself. At the close of the government's case, the court granted a motion for judgment of acquittal on all of the § 924(c) charges. The court denied a motion to exclude all evidence of the guns introduced during the prosecution's case-in-chief. The appellants claim that the government committed prosecutorial misconduct because it never intended to call the witness; they further claim that the defense did not discover the government's intentions until sentencing.[2]
 
 
 29
 "Prosecutorial misconduct does not require reversal unless the misconduct deprives the defendant of a fair trial." United States v. Yarbrough, 852 F.2d 1522, 1539 (9th Cir.1988) (citing Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982)). In this case the § 924(c) charges did not deprive the defendants of a fair trial because all the evidence introduced to prove those charges would have been admissible even without the firearm charges. See United States v. Fagan, 996 F.2d 1009, 1015 (9th Cir.1993) ("[i]t is well-settled that in a trial on drug trafficking charges, firearms are relevant and admissible to prove the defendant's involvement in the drug trade and intent to distribute").
 
 D. Continuing Criminal Enterprise
 
 30
 Julio Ramos was charged with committing a Continuing Criminal Enterprise (CCE). In order to find a defendant guilty of CCE, the jury must find, among other things, that Ramos committed three or more federal felony narcotics violations within Title 21 of the United States Code. United States v. Garcia, 988 F.2d 965, 967 (9th Cir.1993). The district court instructed the jury that one of those offenses could be for violating 18 U.S.C. § 922(g) by acquiring and possessing a firearm while being an illegal alien. That offense does not constitute a felony drug violation and the court erred in including it in the CCE instruction. The error, however, was harmless because the CCE count alleged 43 narcotic violations as predicate offenses and the jury convicted Ramos of 29 of them. There was ample proof of the CCE requirement of three offenses, even without the firearm possession offense.
 
 E. Inventory Search
 
 31
 Ramirez and Robles were each convicted of charge 16 of the indictment, which charged possession of heroin with intent to distribute.[3] That heroin was found in a car the two had been driving.
 
 
 32
 Ramirez was driving with Robles when an officer stopped the vehicle. The police officer brought both Ramirez and Robles to the police station to investigate potential outstanding warrants for their arrest. Officers also brought the car the defendants were in to the police station, but decided that there was no safe place to keep the car there, and they had it towed away. Before having the car towed, one of the officers conducted an "inventory search" of it. In the course of the search, the officer saw a pair of blue jeans in the back seat. The officer took out the jeans and searched the pockets, discovering heroin. Ramirez and Robles were charged with possession of the heroin with intent to distribute. Before trial, Ramirez and Robles moved to suppress the evidence as the fruit of an unreasonable search in violation of the Fourth Amendment. The motion was denied. The defendants contend that searching the pockets of the jeans was impermissible under San Francisco Police Department regulations and therefore constituted an impermissible inventory search. The district court's factual findings supporting a motion to suppress are reviewed for clear error. United States v. Noushfar, 78 F.3d 1442, 1447 (9th Cir.1996). Motions to suppress are reviewed de novo. Id.
 
 
 33
 Inventory searches have been held constitutional if they are conducted in accordance with the standard procedures of the agency conducting the search or come under another exception to the Fourth Amendment warrant requirement. Florida v. Wells, 495 U.S. 1, 3-4, 110 S.Ct. 1632, 1634-35, 109 L.Ed.2d 1 (1990); United States v. Johnson, 936 F.2d 1082, 1084 (9th Cir.1991) (per curiam). San Francisco Police Department Policy provides in relevant part:
 
 
 34
 Visible Property Inventory: Carefully inventory all visible property in the vehicle at the time of impound and record same. Also, state all parts of vehicle that are missing....
 
 
 35
 1) If there is property of extreme value in a visible location, remove the items and book "property for safekeeping."
 
 
 36
 Department General Order, San Francisco Police Department. These regulations specifically provide for cataloging and/or safekeeping "visible" property. They do not permit searching the inside of containers. The government argues that the jeans were visible and they might have contained something valuable. The regulations, however, do not provide authority to look inside of things to find valuable items.
 
 
 37
 The government alternatively contends that the search was lawful as incident to Ramirez's arrest under New York v. Belton, 453 U.S. 454, 460-61, 101 S.Ct. 2860, 2863-64, 69 L.Ed.2d 768 (1981). Belton permitted a search of a car's entire passenger compartment, including the inside of containers, as a search incident to arrest. A search of a car incident to arrest, however, must occur roughly contemporaneously with the arrest. United States v. Moorehead, 57 F.3d 875, 877-78 (9th Cir.1995). This search occurred after the car was moved, the defendants were inside the police station, and the police decided to have the car towed. The search cannot be described as contemporaneous to the arrest.
 
 
 38
 As fruit of an unlawful search, the heroin should have been suppressed. See, e.g., United States v. Garcia-Camacho, 53 F.3d 244 (9th Cir.1995) (suppressing evidence seized as a result of unconstitutional investigatory stop). As the heroin found in the blue jeans was the only basis for Ramirez and Robles's conviction for possession with intent to distribute, their convictions on that count must be overturned.[4]II. The Reyes Trial
 
 A. Refusal to Grant Immunity
 
 39
 Reyes argues that the district court should have granted use immunity to her brother, Jose Luis, and to his friend, Esmerelda Gomez, or in the alternative should have entered a judgment of acquittal as a result of the government's failure to grant them immunity on its own.
 
 
 40
 Immunity is an executive, not a judicial, function, and this court has emphatically rejected the argument that the sixth amendment provides a defendant with a right to demand use immunity for defense witnesses who invoke their privilege against self-incrimination. There is an exception, however, where the prosecutor intentionally distorts the fact-finding process and thereby denies the defendant a fair trial.
 
 
 41
 United States v. Baker, 10 F.3d 1374, 1414 (9th Cir.1993) (as amended) (internal citations and quotations omitted). A district court may "find intentional distortion of the fact-finding process where the government 'grant[s] immunity to a witness in order to obtain his testimony, while denying immunity to a defense witness whose testimony would directly contradict that of the government witness.' " Id. (quoting United States v. Westerdahl, 945 F.2d 1083, 1087 (9th Cir.1991)). The district court's factual finding regarding whether the government did intentionally distort the fact-finding process is reviewed for clear error. Baker, 10 F.3d at 1415.
 
 
 42
 Reyes contends that Jose Luis and Esmerelda's testimony would have contradicted that of government informant Barry Goldstein. Goldstein did not receive official immunity, but was promised that if he assisted with the Ramos investigation and testified truthfully at trial he would not be charged for his past heroin dealings. Jose Luis and Esmerelda received the opportunity to testify with the same degree of immunity from prosecution as Goldstein. Thus, to the extent that their testimony might have contradicted Goldstein's, the failure to offer them any greater immunity did not distort the fact-finding process.
 
 B. Duress Instruction
 
 43
 At her separate trial, Reyes admitted to the acts she was alleged to have committed, but argued that she committed them under duress. The district court instructed the jury on the general defense of duress, but refused Reyes's request to give a more particularized instruction regarding the interplay of duress and the evidence of battering that she presented at trial. A district court's formulation of jury instructions is reviewed for an abuse of discretion. United States v. Woodley, 9 F.3d 774, 780 (9th Cir.1993). The trial judge has substantial latitude so long as the instructions fairly and adequately cover the issues presented. United States v. Powell, 955 F.2d 1206, 1210 (9th Cir.1991). Reyes argues that without the instruction on battered woman syndrome, her defense was not adequately presented to the jury. Despite the general instruction on duress, she contends, the jury could not know how the battering evidence interacted with the legal definition of duress without further explanation. Reyes suggests that because her defense was not adequately presented to the jury, this court reviews the instruction de novo. United States v. Warren, 25 F.3d 890, 895 (9th Cir.1994) (whether instructions adequately cover a defense is reviewed de novo).
 
 
 44
 Reyes suggested the following instructions:
 
 
 45
 Defendant Reyes Proposed Jury Instruction No. 6
 
 Theory of Defense
 
 46
 You have heard evidence that the defendant, Maria Reyes, suffers from battered women [sic] syndrome. In determining if this is true, you may consider the following factors:
 
 
 47
 (a) the nature and length of her relationship with Julio Ramos;
 
 
 48
 (b) the history of prior threats and physical violence between the couple;
 
 
 49
 (c) the socio-economic status of the defendant-that is, was she economically independent, did she have small children to care for;
 
 
 50
 (d) the psychological assessment of her by the expert who testified in this case.
 
 
 51
 If you find from all of your deliberations that evidence presented shows the defendant suffered from battered women [sic] syndrome, you may consider that fact in assessing the reasonableness of the actions she took in furtherance of Julio Ramos's drug conspiracy.
 
 
 52
 A woman who suffers from battered woman syndrome may reasonably believe her actions were necessary at a threshold lower than that which a person who does not so suffer would consider reasonable.
 
 
 53
 Defendant Reyes Proposed Jury Instruction No. 7
 
 Theory of Defense
 
 54
 You must decide if given the facts and circumstances in this case the defendant had reasonable grounds to believe and actually did believe that she was in imminent danger of death or serious bodily injury to she [sic], her child or her family, and that she had no reasonable opportunity to escape.
 
 
 55
 You have heard evidence that Julio Ramos committed prior acts of violence against Ms. Reyes. If, after your consideration of the evidence, you believe this to be true, you may consider that fact in assessing whether she was in reasonable fear of him. The defendant is not required to prove any of these facts beyond a reasonable doubt in order for you to take them into consideration.
 
 
 56
 Whether we review de novo or for abuse of discretion, however, the district court did not err in refusing to read the offered instructions. On appeal, Reyes concedes that the final paragraph of suggested instruction number six was legally inaccurate. We therefore assume, without deciding, that the instruction was improper. It would have been error for the district court to read a legally incorrect instruction to the jury.[5] It cannot, then, be error to refuse to read it.
 
 
 57
 Reyes contends that these instructions would have informed the jury as to what they were permitted to consider when determining whether she suffered from a reasonable fear of immediate harm. However, instruction number seven was substantially covered by the court's instruction. We do not decide whether, under different circumstances, it would have been error to exclude legally accurate instructions that do what Reyes's offered instructions purported to do: put the duress defense in context with evidence of a battering relationship.
 
 C. Reyes's Managerial Role
 
 58
 The district court imposed a two-level upward adjustment on Reyes's sentence after concluding that she held a managerial/supervisory role in the heroin organization. U.S.S.G. § 3B1.1(c) (two-level increase for a defendant who is "an organizer, leader, manager, or supervisor"). This court reviews a district court's findings of fact to support an upward adjustment for clear error. United States v. Ponce, 51 F.3d 820, 826 (9th Cir.1995). Although "[t]he district court need not make specific findings of fact in support of an upward role adjustment," id., the sentencing court made the following findings:
 
 
 59
 In deciding where one fits in terms of relative culpability and role in the offense, the notes tell me to look to the nature of the participation and to the degree of the participation in planning or organizing, and to the degree and control of authority exercised.
 
 
 60
 In this sense it is true that Ms. Reyes played a role of interpreting and translating, but that role is absolutely critical. The enterprise does not work without that role. You have Spanish-speaking customers, Spanish-speaking distributors, and that role makes this all possible. And she understood that and played that role, so the nature of her participation is that the enterprise does not work with anything remotely like that efficiency without her role playing.
 
 
 61
 ...
 
 
 62
 I don't think there is any question but that she played a lesser role than Julio Ramirez [sic] in that Julio Ramirez [sic] was the person who was the overall organizing leader in this particular enterprise; however, I think, as far as the role played by Maria Reyes, it clearly is one because of the nature of what she did, and the degree of her participation in it, and the exercise of control that she did have over others, that she is a manager or supervisor, and she is one that should be--should have a level of increase by two levels.
 
 
 63
 Reyes argues that the court's reliance on the importance of her role as a translator was inadequate to support a finding that she was a manager or supervisor. Without a showing that the defendant had control over others, even a defendant with an important role in an offense cannot be deemed a manager. United States v. Hoac, 990 F.2d 1099, 1110-11 (9th Cir.1993).
 
 
 64
 While the district court did primarily discuss the importance of Reyes's role, it also made reference to the "control that she did have over others." A court's general findings can be sufficient to uphold an upward departure for a supervisor role. Ponce, 51 F.3d at 826. The evidence at trial, including admissions by Reyes, indicated that Reyes dispatched runners whom she selected to distribute the drugs and made decisions regarding where and when to deliver the heroin, particularly when Ramos was not home. We review only for clear error; this evidence sufficiently supports the district court's finding that Reyes controlled others and held a manager or supervisor role.
 
 
 65
 Reyes also argues that, apart from lacking a sufficient evidentiary basis, the district court's adjustment for a managerial enhancement impermissibly punished her for conduct of which she was acquitted by the jury, namely, conspiracy. This argument is foreclosed by the Supreme Court's recent opinion in United States v. Watts, --- U.S. ----, ----, 117 S.Ct. 633, 638, 136 L.Ed.2d 554 (1997), which rejected the reasoning of United States v. Brady, 928 F.2d 844 (1991), on which Reyes relies, and which held instead that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." And, as we have already concluded, sufficient evidence supports the district court's adjustment for Reyes's managerial or supervisory role.
 
 D. Juror Letters
 
 66
 After the close of trial, Reyes's lawyer delivered to the district court letters from four jurors explaining their beliefs that Reyes had in fact been severely abused by her husband. The court accepted the letters, but refused to consider them for sentencing purposes.
 
 
 67
 Reyes argues that the district court erred by refusing to consider these explanatory letters offered by the jurors. We review the district court's decision regarding what evidence it will consider in sentencing for an abuse of discretion. United States v. Ayers, 924 F.2d 1468, 1481 (9th Cir.1991); United States v. Messer, 785 F.2d 832, 834 (9th Cir.1986).
 
 
 68
 Contrary to Reyes's contention, the court did not believe that it could not consider the letters. Rather it noted that:
 
 
 69
 it would be wis[e] for the Sentencing Commission to address that issue and to say they are not to be considered. I think the same kind of public policy considerations that go into the Rules of Evidence rule that says they are not to be considered for impeachment is the same for sentencing, so that I would think that that would be the way the law ought to be structured, but it isn't right now.
 
 
 70
 The court clearly exercised its discretion as to whether to consider the letters. The court's belief that a practice of considering letters of this sort could lead to harassment of jurors is reasonable, and its decision not to consider them was not an abuse of discretion. See Fed.R.Evid. 606(b), Comm. Notes, Sen. Rpt. No. 93-1277 (rule prohibiting jurors from testifying about jury deliberations meant to prevent harassment of jurors).
 
 E. Acceptance of Responsibility
 
 71
 The district court ruled that Reyes's duress defense was inconsistent with acceptance of responsibility. United States v. Johnson held that defendants who rely on a duress defense at trial "are not entitled to a reduction for acceptance of responsibility." 956 F.2d 894, 904 (9th Cir.1992). If, however, a defendant accepts responsibility for her crime by statements after the conviction, she may receive a downward departure for that acceptance of responsibility. Id. at 905.
 
 
 72
 In this case, the district court did not rely solely on Johnson to preclude the acceptance of responsibility departure, but noted instead that:
 
 
 73
 The best thing to say is it's your burden to show acceptance of responsibility, and it's clear to the court that hasn't been met, and there is no showing of acceptance of responsibility sufficient to allow the court to permit any reduction on that basis.
 
 
 74
 After trial and through this appeal Reyes continued to argue that while she did commit the crimes she did it under compulsion. It was not clear error for the district court to determine that she did not sufficiently accept responsibility to warrant a downward departure.
 
 F. Downward Departures
 
 75
 At sentencing, the district court considered the mitigating nature of the evidence of abuse Reyes suffered at the hands of Ramos.
 
 
 76
 I have said, I think, that that conduct is something that should be factored in, and it's a question of how one does it.... It's the abuse of the--the way in which Julio [Ramos] treated Maria Reyes that leads to all of this. Lack of youthful guidance, duress, whatever you want to call it, battered woman's syndrome is the same thing.
 
 
 77
 ...
 
 
 78
 [T]he role played by whoever deprived her of guidance was--happens to be the same person all the way through ... there is a lack of youthful guidance.
 
 
 79
 There is also a level of abuse, battered woman's syndrome, of pressure. That all comes about from the same person. So it's the same thing that goes on all the way through.
 
 
 80
 Based on this understanding of the three available departures as overlapping, the court departed downward two levels for youthful lack of guidance and refused to make findings regarding imperfect duress (U.S.S.G. § 5K2.12) and battered woman's syndrome as it relates to diminished capacity (U.S.S.G. § 5K2.13). The government argues that the court's decision not to depart downward is unreviewable. United States v. Morales, 972 F.2d 1007, 1011 (9th Cir.1992) (discretionary refusal to depart downward not subject to review). A court's interpretation of the guidelines, however, is reviewed de novo. United States v. Canon, 66 F.3d 1073, 1077 (9th Cir.1995). We cannot determine from the district court's comments during the sentencing phase whether it believed that the three possible departures--because they had similar factual bases--legally overlapped completely, thus preventing the court from departing on more than one ground; or whether it recognized that each ground was an available departure but simply exercised its discretion to depart under only one of the three. We therefore remand to the district court to permit it clearly to exercise its discretion in deciding whether to depart downward under one, two, or all three of the potential guideline statements.
 
 
 81
 The three potentially applicable departures are founded in distinct policy rationales and recognize separate reasons for reduced culpability. At the time of Reyes's offense, youthful lack of guidance was a valid basis for a downward departure. See United States v. Floyd, 945 F.2d 1096, 1100 (9th Cir.1991). Such a departure recognizes that lack of adult guidance and education "may have led a convicted defendant to criminality." Id. at 1101. While the Sentencing Commission later decided that youthful lack of guidance was not relevant to sentencing decisions, U.S.S.G. § 5H1.12 (1992), this departure was available to Reyes and continues to be so.
 
 
 82
 Coercion or duress was and is a separate ground for downward departure. U.S.S.G. § 5K2.12. The duress policy statement allows that "[i]f the defendant committed the offense because of serious coercion ... or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence." Id. "[I]t has been held that the injury threatened need not be imminent" in order to apply this departure. Johnson, 956 F.2d at 898. The guideline's statement "directs the sentencing court's attention to the defendant's subjective evaluation of the circumstances in which the defendant was placed." Id.
 
 
 83
 Finally, diminished capacity provides an alternative basis for downward departure. That policy statement provides:
 
 
 84
 If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.
 
 
 85
 U.S.S.G. § 5K2.13. Reyes argues that battered woman syndrome, a form of post-traumatic stress disorder, can cause such diminished capacity. One symptom of this disorder is learned helplessness, which may prevent an abused woman from leaving her batterer. Johnson, 956 F.2d at 899 (citing Leonore Walker, The Battered Woman Syndrome 33, 94 (1984)). This perceived inability to leave may have contributed to Reyes's commission of the crime.
 
 
 86
 The three departures are separate and distinct. In United States v. Roe, 976 F.2d 1216 (9th Cir.1992), this court remanded for the district court to determine whether a defendant's history warranted departure for both history of child abuse and youthful lack of guidance. The court relied on the same evidence to support both departures and indicated that the district court had discretion to decrease the defendant's sentence under both departures. Id. at 1218.
 
 
 87
 We do likewise. It is unclear whether the district court believed that the three grounds for departure were duplicative and therefore could not be considered separately. Because the court clearly took the history of abuse into consideration, we remand for the district court to make findings on imperfect duress and diminished capacity as it relates to battered woman syndrome, and to exercise its discretion to depart under these two additional grounds if the facts of Reyes's case warrant such departure. See Fed. R.Crim. Proc. 32(c)(1) (court must make finding on each controverted matter it will consider at sentencing).
 
 
 88
 G. Joint Participant in Crime Exception to the Spousal Testimonial Privilege
 
 
 89
 After her conviction and while serving her sentence, Reyes invoked the spousal testimonial privilege and refused to testify at her husband Ramos's trial. The district court found that there was an exception to the privilege when spouses are jointly involved in a criminal enterprise, and held her in contempt when she continued to refuse to testify. The weeks Reyes spent in prison during the Ramos trial, then, were charged to her contempt citation and did not amount to time served on her earlier sentence. She contends that the district court erred in finding the exception, and that she should be granted time-served status for those weeks she spent in prison during the second trial.[6]
 
 
 90
 Federal common law recognizes two different marital privileges. United States v. Marashi, 913 F.2d 724, 729 (9th Cir.1990).[7] One bars testimony concerning statements privately communicated between spouses and may be invoked by the testifying or nontestifying spouse ("marital communications privilege"). Id. The second permits a person to refuse to testify against her spouse about anything ("testimonial privilege"). Id.; Trammel v. United States, 445 U.S. 40, 53, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980) (holding that the privilege lies with the testifying spouse). Reyes claimed the second of these privileges when she refused to testify at her husband Julio Ramos's trial.
 
 
 91
 A district court's construction of the Federal Rules of Evidence is a question of law subject to de novo review. United States v. Manning, 56 F.3d 1188, 1196 (9th Cir.1995).
 
 
 92
 This circuit has held that "the marital communications privilege does not apply to communications having to do with present or future crimes in which both spouses are participants." Marashi, 913 F.2d at 730. The Marashi court reasoned that the "[u]se of the privilege in criminal proceedings requires a particularly narrow construction because of society's strong interest in the administration of justice." Id. The court quoted the Second Circuit as follows:
 
 
 93
 The [circuits] which recognize that 'partnership in crime' exception to the confidential communication privilege believe that greater public good will result from permitting the spouse of an accused to testify willingly concerning their joint criminal activities than would have come from permitting the accused to erect a roadblock against the search for truth.
 
 
 94
 Id. (quoting United States v. Estes, 793 F.2d 465, 466 (2d Cir.1986)).
 
 
 95
 While the Ninth Circuit has not addressed the question of whether there is a joint participant exception to the testimonial privilege that can force an unwilling spouse to testify against her husband, the Supreme Court has stated that in such a case "the witness may be neither compelled to testify nor foreclosed from testifying." Trammel, 445 U.S. at 53, 100 S.Ct. at 913. Thus, we hold that there is no joint participant exception to the testimonial privilege and Reyes was improperly compelled to choose between testifying against her husband and facing contempt charges. On remand, the district court should credit Reyes's sentence with the time she served while being held in contempt.
 
 CONCLUSION
 
 96
 We remand to the district court for further proceedings consistent with this opinion.
 
 
 97
 AFFIRMED in part; REVERSED in part; and REMANDED.
 
 
 
 [1]
 Although, as we conclude in Part II(F), Reyes could not be compelled to testify against Julio at his trial, her assertion of spousal privilege did not in turn provide grounds for Julio to object to the introduction at his trial of transcripts of her testimony in her own trial. The privilege lies with the testifying spouse. Trammel v. United States, 445 U.S. 40, 53, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). As Julio was not the spouse being asked to testify, he had no privilege to assert
 
 
 [2]
 As appellants concede, this issue was not raised before the trial court. However, as resolution of the claim turns on a pure question of law, namely, the general admissibility of firearms evidence in a drug trafficking trial, we may decide this issue on appeal. See United States v. Flores-Payon, 942 F.2d 556, 558 (9th Cir.1991)
 
 
 [3]
 Count 16 was Ramirez's sole count of conviction and one of three counts on which Robles was convicted. Robles's other two counts of conviction are not at issue in this appeal
 
 
 [4]
 Ramirez and Robles argue that their convictions and sentences on this count were faulty for other reasons as well. Specifically, they argue that the police officers lacked probable cause to pull them over, that there was insufficient evidence to convict them of the heroin charge, and that routine destruction of the jeans violated due process; Ramirez further argued that the district court erred in calculating relevant conduct for sentencing purposes. Because of our decision that the heroin should have been suppressed, those issues become moot and we need not reach them
 
 
 [5]
 The district court instructed the jury:
 When a defendant acts under duress at the time of the commission of the offense, the defendant does not act willfully or intentionally under the law. This means that a defendant who acts under duress at the time of committing an offense is not responsible for the crime committed.
 A defendant acts under duress only if three things exist at the time the offense is committed:
 First, there was an immediate threat of death or serious bodily injury to the defendant if the defendant did not commit or participate in the commission of the crime; and
 Second, the defendant had a well-founded and reasonable fear that the threat of death or serious bodily injury would be carried out; and
 Third, the defendant had no reasonable opportunity to escape the threatened harm.
 If the government fails to prove the absence of duress beyond a reasonable doubt, then you must find the defendant not guilty.
 
 
 [6]
 The government contends that Reyes was required to file a separate notice of appeal regarding the contempt order and that the contempt issue was not expressly mentioned in her notice of appeal from her conviction and her sentence, and therefore we should not consider her claim. However, as we cannot see how the government was misled or disadvantaged by Reyes's failure separately to appeal the contempt sanction or expressly to mention the contempt sanction in her notice of appeal, we reject the government's argument. See Litchfield v. Spielberg, 736 F.2d 1352, 1355 (9th Cir.1984)
 
 
 [7]
 Federal Rule of Evidence 501 indicates that privileges "shall be governed by the principles of the common law." Fed.R.Evid. 501, quoted in Marashi, 913 F.2d at 729 n. 6