GOODWIN, Circuit Judge.
 

 Defendants James Montgomery and Mary Lou O’Connor were convicted by a jury of conspiring to commit mail fraud and committing mail fraud in violation of 18 U.S.C. §§ 371 and 1341. Montgomery challenges the district court’s denial of his claim that the marital privilege excludes evidence of his wife’s communications to him. Both defendants also challenge the indictment, the sufficiency of the evidence, the district court’s admission of a summary exhibit and their sentences.
 

 I.
 

 In 1983, Montgomery and his wife, Louise Montgomery (“Mrs.Montgomery”), formed Sun Village Realty, Inc. (“Sun Vil
 
 *1054
 
 lage”), a real estate and property management business in Sunriver, Oregon. The property management component of Sun Village, Summit Realty, entered into contracts with the owners of vacation houses in Sunriver, many of whom lived elsewhere. In return for a twenty five to thirty percent commission, Sun Village agreed to “diligently, and to the best of its abilities, rent the property!,] ... obtain new tenants as vacancies occur,” and “clean[] the property each time a tenant checks out.” The contract did not provide for, nor expressly prohibit, use of the vacation houses, or “units,” by Sun Village, its employees or its guests without notice and compensation to the owner.
 

 Reservations were processed at Sun Village’s office. Clerks fielded calls and consulted the calendar board that hung in the office to determine which units were available. A reservation would be written on the calendar board and recorded in the computer. A software program generated a monthly statement (“owners’ statement”) that would be mailed to each owner, reporting the rental activity, receipts, charges and fees. Reservations not entered into the computer did not appear on the owner’s statement. After a unit had been occupied, a housekeeper would clean the unit, and an “R” would be written on the calendar board, signifying that the unit was ready for the next tenant. Because the units would be independently cleaned after maintenance had been done, the owner generally incurred a full cleaning charge only if the unit had been occupied.
 

 Mrs. Montgomery oversaw Sun Village’s reservation office from 1989 until October 1992, when O’Connor moved to Sunriver to assist Montgomery, her brother, with legal issues unrelated to this case. Unwilling to work with O’Connor, Mrs. Montgomery left the office, and O’Connor assumed responsibility for the owners’ statements. O’Connor purchased and lived in a duplex called “Goldfinch,” which she occasionally rented to customers. She invested about $200,000 in Sun Village.
 

 In January 1994, Mrs. Montgomery returned to the office. She noticed “very unusual situations with reservations and money.” She suspected that O’Connor was diverting money from owners by assigning reservations to units that were no longer managed by Sun Village and by deleting reservations. Mrs. Montgomery discussed the irregularities with Montgomery “numerous times,” and wrote him a note on a business record that stated, “Just another unit where[0’Connor] is hiding Reservations].” Frustrated by his inaction, she expressed her concerns in a letter she left for him on the kitchen counter of their residence. She wrote that she would not “be part of a dishonest operation,” would not prepare owners’ statements unless his “sister stops stealing,” and would not solicit new owners because they “will probably be cheated.” Mrs. Montgomery subsequently joined the conspiracy, however, and began omitting one night rentals from the owners’ statements and creating inaccurate owners’ statements.
 

 The owners ultimately began to notice the decreased rental activity and unreported uses of their units. One owner became suspicious when she found that the rental activity in the owner’s statement did not contain the names of the renters who had signed the guest-book, and that renters discussed a longer occupancy than that reflected in the statement. Another owner, William Wilson, received information from neighbors that his unit had been used. When the owner’s statement did not reflect the use, Wilson confronted Montgomery, who apologized and explained that a computer or bookkeeping error had probably occurred. Other owners contacted O’Connor about the declining rental
 
 *1055
 
 activity. She referred them to Mrs. Montgomery, who would tell the owners that rentals had been down or that the weather had been bad.
 

 Among the unreported occupants were both paying customers and those whom Sun Village authorized to use the units at no cost. The' calendar board contained a three-week reservation for ‘Yellow Pine 16” in April 1995 made for “Jim M.,” meaning Montgomery. The occupant sent a check to Sun Village for $1,076, but the owner’s statement did not report the rental or the rent received. Although Sun Village later sent a cashier’s check and a promissory note for $9,011.40 to the owner of Yellow Pine 16, it was unclear whether the $1,076 in owed rent was included. Montgomery allowed others to use the units at no cost, a practice that Sun Village described with the terms “freebies” or “complimentary uses.” He directed office staff not to record the freebies in the computer. O’Connor herself stayed in vacant units when she rented Goldfinch. She did not report her stay to the units’ owners, although on two occasions she received permission beforehand and paid rent. Like Montgomery, she instructed office staff not to enter her use of units into the computer.
 

 In October 1995, a state investigator questioned Montgomery about Sun Village’s business practices. Montgomery reportedly said that “he only took money from the owners who didn’t need -their money.” In March 1996, the Criminal Division of the Internal Revenue Service (“IRS”) executed a search of Sun Village’s business records and the Montgomery residence. Mrs. Montgomery’s letter to Montgomery was seized from their bedroom.
 

 In October 1999; a grand jury indicted Montgomery, Mrs. Montgomery and O’Connor on one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, and nineteen counts of either mail fraud or aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341 and 1342. The government obtained a superseding indictment in response to O’Connor’s motion to dismiss the indictment for failing to allege how the monthly mailings were materially false. O’Connor filed a second motion to dismiss the indictment for failure to allege which rental dates were omitted from the monthly reports, and the government obtained a second superseding indictment.
 

 Before trial Mrs. Montgomery agreed to cooperate with the government and to testify against Montgomery and O’Connor. After a five-day trial, the jury convicted both remaining defendants of conspiracy to commit mail fraud, Montgomery of five counts of mail fraud, and O’Connor of two counts of mail fraud. The jury acquitted defendants on the remaining counts. The prosecution dismissed all counts against Mrs. Montgomery.
 

 The district court sentenced Montgomery to twenty-four months imprisonment on each count, to run concurrently, and O’Connor to eighteen months imprisonment on each count, also to run concurrently. Both sentences included a seven-level guideline increase due to the district court’s determination of the amount of loss. Montgomery’s sentence included an enhancement for obstruction of justice because the district court found that he had committed perjury when testifying. The court ordered defendants to pay, jointly and severally, $184,814.70 in restitution to the victims.
 

 n.
 

 Montgomery contends that the district court erred by not permitting him to claim the marital communications privilege to exclude from trial his wife’s correspondence and his wife’s testimony about con
 
 *1056
 
 versations with him. The government counters that Mrs. Montgomery did not intend the information in the letter to remain confidential, that Mrs. Montgomery controls the privilege, and that the privilege does not apply because Mrs. Montgomery became an accessory after the fact. We review de novo the district court’s construction of a federal rule of evidence.
 
 United States v. Angwin,
 
 271 F.3d 786, 798 (9th Cir.2001).
 

 A. Marital Privileges
 

 Federal Rule of Evidence 501 provides that “the privilege of a witness [or] person ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.” The Supreme Court has recognized two privileges that arise from the marital relationship. The first permits a witness to refuse to testify against his or her spouse.
 
 See Trammel v. United States,
 
 445 U.S. 40, 53, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). The witness spouse alone holds the privilege and may choose to waive it.
 
 Id.
 
 Because Mrs. Montgomery decided to testify, the first privilege is not at issue.
 

 The second privilege, called the “marital communications” privilege, provides that “[c]ommunications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged .... ”
 
 Wolfle v. United States,
 
 291 U.S. 7, 14, 54 S.Ct. 279, 78 L.Ed. 617 (1934). The privilege (1) extends to words and acts intended to be a communication; (2) requires a valid marriage; and (3) applies only to confidential communications,
 
 ie.,
 
 those not made in the presence of, or likely to be overheard by, third parties.
 
 United States v. Marashi,
 
 913 F.2d 724, 729-30 (9th Cir.1990);
 
 see also United States v. White,
 
 974 F.2d 1135, 1138 n. 2 (9th Cir.1992). Recognizing that the privilege “obstructs the truth-seeking process,” we have construed it narrowly, particularly in criminal proceedings, “because of society’s strong interest in the administration of justice.”
 
 Marashi,
 
 913 F.2d at 730. The government bears the burden of showing that the communication was not intended to be confidential.
 
 Blau v. United States,
 
 340 U.S. 332, 333, 71 S.Ct. 301, 95 L.Ed. 306 (1951).
 

 There is no dispute that the letter Mrs. Montgomery wrote to her husband was a communication or that the communication was made during a valid marriage, so we must decide whether the information in the letter was intended to remain confidential. In
 
 Wolfle,
 
 the Court stated that “wherever a communication, because of its nature or the circumstances under which it was made, was obviously not intended to be confidential, it is not a privileged communication.” 291 U.S. at 14, 54 S.Ct. 279. Similarly, in
 
 Pereira v. United States,
 
 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), the Court stated:
 

 Although marital communications are presumed to be confidential, that presumption may be overcome by proof of facts showing that they were not intended to be private. The presence of a third party negatives the presumption of privacy. So too, the intention that the information conveyed be transmitted to a third person.
 

 347 U.S. at 6, 74 S.Ct. 358 (citations omitted).
 

 In
 
 United States v. McCown,
 
 711 F.2d 1441 (9th Cir.1983), we concluded that a defendant’s instruction to his wife to write a check was not privileged.
 
 Id.
 
 at 1452. The defendant had directed two co-defendants, who lived with the defendant and his wife, to purchase a gun, and he gave them a check written by his wife.
 
 Id.
 
 at 1452-53. We found the “obvious inference” to be that the defendant had not
 
 *1057
 
 intended to keep his instruction to his wife hidden or secret from his co-defendants.
 
 Id.
 
 at 1453.
 

 Here, the letter begins, “Dear Jimmy,” and ends, “Love, Louise.” Mrs. Montgomery left the letter on the kitchen counter of the couple’s home, and it was recovered from the couple’s bedroom during the execution of a search warrant. The letter states, “If you can’t stop [O’Connor] or if we can’t stop her together I am going to write to her or talk to her.” When asked at trial whether she intended for Montgomery to keep “that information” to himself, Mrs. Montgomery answered: “No, I was hoping he would communicate it to his sister, Mary O’Connor.”
 

 As in
 
 Blau,
 
 the nature of the communication — a handwritten letter from a wife to a husband that was left on the kitchen counter of the couple’s home — is “of the kind likely to be confidential.” 340 U.S. at 333-34, 71 S.Ct. 301. Unlike in
 
 MeCown,
 
 we cannot draw the “obvious inference” that Mrs. Montgomery understood her request of Montgomery would be transmitted to O’Connor or that O’Connor would infer that Montgomery was acting at Mrs. Montgomery’s direction. That the letter implored Montgomery to communicate the substance of her concerns to O’Connor does not render the letter itself non-confidential.
 

 The government has also failed to show that letter’s location on the kitchen counter was an indication that it was not intended to be confidential. The fact that the couple’s children resided in the house is not sufficient to establish this intention. There is no evidence that the children would likely have seen or read the letter, or that Mrs. Montgomery acted without regard to whether the children would have seen it. We will not cast aside the presumption of confidentiality by speculating that the communication was made in the presence of, or was likely to be seen by, the couple’s children.
 

 B. Holder of the Privilege
 

 We must next decide whether Montgomery could invoke the marital communications privilege to exclude Mrs. Montgomery’s communications. In admitting the evidence, the district court relied on
 
 United States v. Figueroa-Paz,
 
 468 F.2d 1055 (9th Cir.1972), where we stated: “Another privilege protects marital communications. It belongs to the communicating spouse, and likewise may be waived.”
 
 Id.
 
 at 1057. The waiver we referred to, however, was the appellant’s failure “to object to his wife’s testimony as to his'communications when it was offered.”
 
 Id. Figueroa^-Paz
 
 stands for the rule that the marital communications privilege will be waived if an objection is not timely made. Our statement that the communicating spouse alone holds the privilege was nonbinding
 
 dictum.
 
 The identity of the holder of the privilege was not germane to the resolution of the case.
 

 Neither the Supreme Court, nor this court, has interpreted the privilege as belonging exclusively to the communicating spouse. In
 
 Blau,
 
 the Court had “no doubt” that the recipient of a marital communication could claim “his privilege” to refuse to reveal the information to authorities. 340 U.S. at 334, 71 S.Ct. 301;
 
 see also United States v. Weinberg,
 
 439 F.2d 743, 750 (9th Cir.1971) (“As established in
 
 Blau,
 
 this privilege includes within its protection information obtained by the witness from his or her spouse, providing the information was privately conveyed.”). Since
 
 Figueroa-Paz,
 
 and without once endorsing its narrow interpretation of the privilege, we have construed the privilege to bar testimony “concerning communications between the spouses.”
 
 See In re Grand Jury Investigation (Hipes),
 
 603
 
 *1058
 
 F.2d 786, 788 (9th Cir.1979) (privilege “permits either spouse ... to assert the privilege to bar testimony concerning confidential communications between the spouses during their marriage.”);
 
 see also United States v. Ramos-Oseguera,
 
 120 F.3d 1028, 1042 (9th Cir.1997),
 
 overruled on other grounds by United States v. Nordby,
 
 225 F.3d 1053, 1059 (9th Cir.2000) (privilege “bars testimony concerning statements privately communicated between spouses and may be invoked by the testifying or nontestifying spouse”);
 
 White,
 
 974 F.2d at 1137-38;
 
 Marashi,
 
 913 F.2d at 729;
 
 United States v. Bolzer,
 
 556 F.2d 948, 951 (9th Cir.1977).
 

 Our sister circuits have also ruled that communications between the spouses are privileged, without vesting the privilege exclusively in the communicating spouse.
 
 See, e.g., United States v. Lea,
 
 249 F.3d 632, 641 (7th Cir.2001) (“The privilege, which can be asserted by either spouse, applies only to communications made in confidence between the spouses during a valid marriage.”);
 
 United States v. Bahe,
 
 128 F.3d 1440, 1442 (10th Cir.1997) (“[Esther spouse may assert [the privilege] to prevent the other from testifying to confidential communications made during the marriage.”);
 
 United States v. Hall,
 
 989 F.2d 711, 716 n. 8 (4th Cir.1993);
 
 United States v. Porter,
 
 986 F.2d 1014, 1018 (6th Cir.1993) (“This privilege is assertable by either spouse.”);
 
 United States v. Jackson,
 
 939 F.2d 625, 627 (8th Cir.1991);
 
 United States v. Wood,
 
 924 F.2d 399, 401-02 (1st Cir.1991) (“[T]he government cites no case holding that the privilege barring disclosure of confidential communications between spouses may be waived over the objection of the non-testifying spouse.”);
 
 United States v. Ammar,
 
 714 F.2d 238, 258 (3d Cir.1983) (“[T]he marital communications privilege prevents a testifying spouse from disclosing confidential communications between the spouses.”).
 

 Although “federal courts follow the federal common law regarding privileges in federal criminal proceedings,”
 
 United States v. Espino,
 
 317 F.3d 788, 795 (8th Cir.2003), in
 
 Trammel
 
 the Supreme Court found “special relevance” in state law trends “because the laws of marriage and domestic relations are concerns traditionally reserved to the states.” 445 U.S. at 49-50, 100 S.Ct. 906. Following the Court’s lead by looking to the states, we count thirty-three states plus the District of Columbia that permit the non-communi-eating spouse to invoke the privilege outright or on behalf of the communicating spouse.
 
 [1]
 

 Considering the language in
 
 Blau,
 
 our decisions since
 
 Figueroa-Paz,
 
 and the decisions of our sister circuits — as well as the practice of the majority of the states— we hold that either spouse may assert the privilege to prevent testimony regarding
 
 *1059
 
 communications between spouses. Vesting the privilege in both spouses recognizes that allowing the communicating spouse to disclose one side of a conversation would eviscerate the privilege. As one treatise has observed, permitting each spouse to testify as to his or her own statements “invites attempts to prove circumstantially the statements of one spouse by proof of what the other had said.” 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 207 (2d ed.1994).
 

 Here, Mrs. Montgomery’s letter was received as proof that she had conveyed her suspicions to Montgomery and that he therefore had notice of O’Connor’s culpable activities. The government makes its purpose clear in its opening brief: “James Montgomery’s criminal intent was proved by his inaction when confronted by his wife about his sister’s theft from the clients.” The government was able to prove circumstantially that he and Mrs. Montgomery had discussed O’Connor’s theft. Accordingly, we conclude that the district court erred in admitting the letter and in allowing the government to inquire at trial about their communications.
 
 [2]
 

 C. Exceptions
 

 The government’s alternative argument, that the letter was not privileged because Mrs. Montgomery was an accessory after the fact, is a non-starter. The government contends that Mrs. Montgomery became an accessory when she returned to the business in January 1994 and participated in the conspiracy until its completion. However, the government does not explain the crime to which Mrs. Montgomery served as an accessory after the fact, or how Mrs. Montgomery could be both a eo-conspirator and an accessory after the fact during the conspiracy.
 

 According to 18 U.S.C. § 3, an accessory after the fact is one who, “knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender to hinder or prevent his apprehension.”
 
 See United States v. Graves,
 
 143 F.3d 1185, 1189 (9th Cir.1998) (observing that conspiracy occurs “before or simultaneous with” the principal offense, while the offense of accessory after the fact occurs — as its name suggests— “afterwards”);
 
 see also United States v. Irwin,
 
 149 F.3d 565, 571 (7th Cir.1998) (“Accessories after the fact are ones who give aid
 
 after the criminal endeavor has ended
 
 to keep the one aided from being caught or punished.” (emphasis added)). Mrs. Montgomery was indicted on the conspiracy count, which was alleged to have continued until 1996, and each of the substantive counts of mail fraud, all of which occurred after January 1, 1995. Because we can find no completed crime to which Mrs. Montgomery served as an accessory after the fact, and the government suggests none, we need not decide whether the exception would permit admission of her testimony.
 

 The government concedes that the “partnership in crime” exception does not apply because Mrs. Montgomery’s statements were not in furtherance of any criminal activity. Although we are inclined to agree with this rationale, a more fundamental element is wanting. Here, Mrs. Montgomery’s communications encouraged Montgomery to take action to end O’Con-nor’s stealing. According to the government, Mrs. Montgomery joined the con
 
 *1060
 
 spiracy only after those efforts proved fruitless.
 

 In
 
 Marashi,
 
 we held that “the marital communications privilege does not apply to statements made in furtherance of joint criminal activity.” 913 F.2d at 731. Because Mrs. Montgomery had not become a participant at the time of her communications, no joint criminal activity had been undertaken. Accordingly, the exception does not apply. The majority of our sister circuits agree that communications made before a spouse begins to participate in the criminal activity are privileged.
 
 Compare United States v. Westmoreland,
 
 312 F.3d 302, 308 (7th Cir.2002);
 
 United States v. Bey,
 
 188 F.3d 1, 6 (1st Cir.1999);
 
 United States v. Evans,
 
 966 F.2d 398, 401 (8th Cir.1992);
 
 United States v. Estes,
 
 793 F.2d 465, 468 (2d Cir.1986);
 
 United States v. Mendoza,
 
 574 F.2d 1373, 1381 (5th Cir.1978);
 
 with United States v. Neal,
 
 743 F.2d 1441, 1447 (10th Cir.1984).
 
 [3]
 

 In sum, the district court erred in admitting Mrs. Montgomery’s letter and her testimony recounting her conversations with Montgomery. Because the government conceded at oral argument that any error was prejudicial, we reverse Montgomery’s convictions.
 

 III.
 

 O’Connor challenges her conviction on three grounds: (A) that the government’s case-in-chief at trial constituted a constructive amendment of, or fatal variance from, the indictment; (B) that the district court erred in admitting the government’s summary exhibit; and (C) that the evidence was insufficient to support her convictions.
 

 A. Constructive amendment of, or fatal variance from, the indictment
 

 O’Connor argues that the government’s evidence showed that monthly reports incorrectly reported the number of uses, rather than incorrectly reporting the rental activity and income as alleged in the indictment. She also contends that the government strayed from the indictment by failing to show that the owners were deprived of income by unauthorized uses. An indictment may not be broadened by amendment, either literally or constructively, except by the grand jury.
 
 United States v. Adamson,
 
 291 F.3d 606, 614 (9th Cir.2002). “ ‘An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them.’ ”
 
 Id.
 
 (quoting
 
 United States v. Von Stoll,
 
 726 F.2d 584, 586 (9th Cir.1984)). On the other hand, a variance occurs where the facts presented at trial materially differ from those alleged in the indictment.
 
 Id.
 
 Although the line between the two can be “difficult to draw,” the distinction is critical: a constructive amendment requires reversal, whereas a variance requires reversal only if it affects the defendant’s substantial rights.
 
 Id.
 
 at 615.
 

 At trial the government sought to prove that defendants fraudulently used the owners’ statements to conceal the occupancies that did not generate rent. Only paragraph twelve of the indictment discussed how the mail was used. It charged defendants with mailing owners’ statements that “knowingly withheld information such as rental dates, number of nights units were rented, total amount of money received from such rentals and net rents due the owners.” Before trial the district court
 
 *1061
 
 restricted the government to' proving these specific inaccuracies in the statements. Paragraph fourteen of the indictment, on the other hand, charged defendants with “stayfing] or allowing] others to stay in units without notice and payment to owners.” However, failing to provide notice does not constitute mail fraud unless it can be linked to the mails, which, as noted, paragraph twelve does not do. The government acknowledged the distinction in its response to defendants’ motion for acquittal: “[I]t was entirely reasonable' for the jury to conclude that, with regard to ‘freebies,’ the monthly statements were technically accurate as to ‘rentals,’ but were intended to create the false impression in the minds of the owners that their property had not otherwise been used.”
 

 We conclude that the disconnect between paragraphs twelve and fourteen of the indictment constituted at most a non-fatal variance. The omitted information from the owners’ statements was relevant to the same charge — mail fraud — and the grand jury indicted defendants for unauthorized stays without notice or payment to the owners.
 
 See Adamson,
 
 291 F.3d at 616 (finding a variance, rather than a constructive amendment, where only the “content of the misrepresentation” differed). There is little danger of double jeopardy because defendants were charged with their unauthorized uses of the units. Defendants were not caught off-guard; they examined the owners about whether the contract obligated defendants to disclose their use of the units.
 
 Cf. Adamson,
 
 291 F.3d at 616.
 

 We also conclude that the government was not required to prove that the unauthorized uses “deprived the owners of rent from legitimate renters,” as alleged in paragraph fourteen of the indictment. Establishing that the owners were deprived of rental proceeds because legitimate renters were excluded was not necessary to prove the existence of a fraudulent scheme or a mailing. Thus, the language was surplusage because it did not go to an element of the offense.
 
 See United States v. Jenkins,
 
 785 F.2d 1387, 1392 (9th Cir.1986) (“Insofar as the language of an indictment goes beyond alleging elements of the crime, it is mere surplusage that need not be proved.”).
 

 B. Government’s summary exhibit
 

 O’Connor argues that the district court should have excluded the government’s exhibit summarizing the unreported rentals as irrelevant, unreliable, and prejudicial under Federal Rules of Evidence 402, 403 and 404(b).
 

 We review de novo whether evidence falls within the scope of Rule 404(b).
 
 United States v. Williams,
 
 291 F.3d 1180, 1189 (9th Cir.2002), and we review for an abuse of discretion the district court’s finding that the evidence is not unfairly prejudicial.
 
 United States v. Verduzco,
 
 373 F.3d 1022, 1029-30 (9th Cir.2004).
 

 In
 
 United States v. Williams,
 
 989 F.2d 1061 (9th Cir.1993), we stated that “[e]vi-dence should not be considered ‘other crimes’ evidence when the evidence concerning the other act and the evidence concerning the crime charged are inextricably intertwined.”
 
 Id.
 
 at 1070 (internal quotation marks, alteration, and citation omitted). We explained ,that”[t]he policies underlying rule 404(b) are inapplicable when offenses committed as part of a single criminal episode become other acts simply because the defendant is indicted for less than all of his actions.”
 
 Id.
 
 (internal quotation marks and citation omitted). Likewise, in
 
 United States v. Lillard,
 
 354 F.3d 850 (9th Cir.2003), we applied
 
 Williams
 
 in concluding that the defendant’s theft of cocaine from a shipment, which provided the basis of the conspiracy,
 
 *1062
 
 was “inextricably intertwined” with the conspiracy charge and therefore admissible without regard to Rule 404(b). 354 F.3d at 854;
 
 see also United States v. Vizcarra-Martinez,
 
 66 F.3d 1006, 1012 (9th Cir.1995) (“Thus, when it is clear that particular acts of the defendant are part of, and thus inextricably intertwined with, a single criminal transaction, we have generally held that the admission of evidence regarding those acts does not violate Rule 404(b)”).
 

 The government’s exhibit, entitled “Summary of Rentals Not Reported to Owners; All Years 1993-1994-1995,” listed 1,006 discrepancies between the owners’ statements and the cleaning records or reservation calendars, 2,154 rental-nights that had not been reported, and $264,021 in lost income to the owners. An IRS agent testified that the exhibit was created by determining whether a stay had occurred without notice and calculating the amount of income that would have been generated. We conclude that each action was “inextricably intertwined” with the conspiracy, and therefore not subject to Rule 404(b), because each occurred within the temporal scope of the conspiracy and comprised the conspiracy.
 
 See Lillard,
 
 354 F.3d at 854;
 
 Williams,
 
 989 F.2d at 1070;
 
 see also United States v. Lanas,
 
 324 F.3d 894, 901 (7th Cir.2003).
 

 The district court did not abuse its discretion in finding the evidence to be relevant and not unfairly prejudicial. The exhibit was relevant because it outlined the government’s theory of the scope of the conspiracy based on the seized records. No unfair prejudice resulted, both because the district court gave a limiting instruction and because defendants had notice of the exhibit and an opportunity to cross-examine the agent about her assumptions.
 
 Cf. United States v. DeGeorge,
 
 No. 02-50365, *25 (9th Cir. Aug. 3, 2004) (concluding no abuse of discretion in admitting evidence that was “inextricably intertwined” with the charges).
 

 C. Sufficiency of the evidence
 

 O’Connor argues that the evidence was insufficient to support her convictions because her conduct did not deprive the owners of income, the mailing element was not satisfied, and the government failed to prove that the conspiracy existed within the statute of limitations.
 

 We review de novo a claim of insufficient evidence.
 
 United States v. Odom,
 
 329 F.3d 1032, 1034 (9th Cir.2003). Sufficient evidence supports a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the claim beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 To prove a conspiracy under 18 U.S.C. § 371, the government must establish “(1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime.”
 
 United States v. Johnson,
 
 297 F.3d 845, 868 (9th Cir.2002). The agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture.
 
 United States v. Romero,
 
 282 F.3d 683, 687 (9th Cir.2002). After a conspiracy is established, proof of the defendant’s connection to the conspiracy must be shown beyond a reasonable doubt, but the connection can be slight.
 
 Johnson,
 
 297 F.3d at 868.
 

 First, there was sufficient evidence of an agreement to engage in criminal activity. Office staff testified that O’Connor and Montgomery instructed them not to record “complimentary uses”
 
 *1063
 
 in the computer, thereby concealing the activity from the owners. O’Connor forwarded complaints from owners to Mrs. Montgomery, who would then return the call and offer an excuse for the missing rental activity. Finally, Mrs. Montgomery omitted one-night rentals and Montgomery’s and O’Connor’s unauthorized uses from the owners’ statements. A reasonable jury could have concluded that all three defendants worked in concert to conceal the unauthorized uses from the owners by mailing false owners’ statements, and by assuring the owners that nothing was amiss with the rental program.
 

 Second, an overt act occurred after the statute of limitations began to run in October 1994. Overt act nine was alleged to have occurred in January 1995, and overt act ten was alleged to have occurred in February 1995. O’Connor was convicted of the two substantive counts that paralleled these overt acts. That the indictment included overt acts performed outside the statute of limitations does not compel reversal; the district court instructed the jury that it must find an overt act that occurred after October 1994.
 
 See United States v. Fuchs,
 
 218 F.3d 957, 961 (9th Cir.2000).
 

 Finally, a reasonable jury could have found that O’Connor understood that her use of vacant units without paying rent was fraudulent, and that she used the mails to perpetrate the fraudulent activity. On at least two occasions she contacted the owner of a unit and paid rent for her stay. But when she occupied “Tennis Village 42” and “Tennis Village 26” while renting out her own residence, the owners’ statements did not disclose the use. As noted, the jury also heard evidence that O’Connor directed office staff not to include her uses in the owners’ statements. A reasonable jury could have concluded that O’Connor instructed the office personnel not to include her occupancies in order to conceal her occupancies and thereby avoid her obligation to pay rent to the owners.
 

 To obtain a conviction for mail fraud under 18 U.S.C. § 1341, the government must prove that the defendant “(1) participated in a scheme with the intent to defraud, and (2) the scheme used or caused the use of the mails in furtherance of the scheme.”
 
 Johnson,
 
 297 F.3d at 870. The mailing element is satisfied if the government can show that the defendant knew or could reasonably foresee that the mail would be used in the ordinary course of business.
 
 Pereira,
 
 347 U.S. at 8-9, 74 S.Ct. 358;
 
 see also United States v. Serang,
 
 156 F.3d 910, 914 (9th Cir.1998). “In general, to be in furtherance of a scheme, the charged mailing or wire transmission need not be an essential element of the scheme, just a step in the plot.”
 
 United States v. Shipsey,
 
 363 F.3d 962, 971 (9th Cir.2004) (internal quotation marks and citation omitted).
 

 Regarding count three, Mrs. Montgomery testified that O’Connor stayed in “Tennis Village 42” from January 19 until January 22, 1995, and the calendar board showed her initials adjacent to those days. An “R” was listed for the unit on January 25, indicating that the unit had been cleaned after being occupied, and a housekeeper’s record showed a full charge. The owner’s statement did not disclose O’Connor’s stay. Regarding count five, the reservation calendar showed O’Connor’s initials next to “Tennis Village 26” from February 8 to February 15, 1995, and an “R” for February 16. A housekeeper testified that Tennis Village 26 had received a full cleaning, and the owner’s statement did not list O’Connor’s use of the unit. A reasonable jury could have concluded that O’Connor occupied the units with the intent to defraud the owners of the rent they were due.
 

 
 *1064
 
 A reasonable jury could also have found beyond a reasonable doubt that the mailing element was satisfied. Viewing the evidence in the light most favorable to the prosecution, O’Connor understood that owners’ statements would be mailed in the ordinary course of business, and she took measures to limit the information contained therein because she knew that owners expected to be paid for her stays. Because “the success of [defendants’] venture depended upon [their] continued harmonious relations with, and good reputation among the [owners],”
 
 Schmuck v. United States,
 
 489 U.S. 705, 711-12, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), omitting the unauthorized uses from the owners’ statements furthered the ongoing scheme by avoiding inquiries from the owners about why certain occupancies generated no rent.
 

 Thus, we affirm O’Connor’s convictions for conspiring to commit and committing mail fraud.
 

 IV.
 

 O’Connor contends that the district court erred in calculating the loss and by imposing a greater amount of restitution than the amount of loss. She incorporates by reference Montgomery’s argument that applying the Mandatory Victim’s Restitution Act of 1996 (“MVRA”) was improper because the crimes were completed before its enactment.
 

 We review de novo the legality of a restitution order and the district court’s valuation methodology.
 
 United States v. Doe,
 
 374 F.3d 851, 854 (9th Cir.2004). We review for clear error the court’s underlying factual findings.
 
 Id.
 

 “Applying the MVRA to crimes committed prior to the MVRA’s effective date of April 24, 1996 generally violates the ex post facto clause.”
 
 United States v. Grice,
 
 319 F.3d 1174, 1177 (9th Cir.2003). A reason is that “Restitution under the [Victim and Witness Protection Act] is discretionary, and the district court must consider a defendant’s resources when deciding if restitution is appropriate.”
 
 See United States v. De La Fuente,
 
 353 F.3d 766, 769 (9th Cir.2003) (citing 18 U.S.C. § 3663(a)(1)(A), (B)). The conspiracy here ended on March 19, 1996. The presen-tence report (“PSR”) applied the MVRA, stating that full restitution was required by the MVRA without regard to a defendant’s ability to pay. The district court adopted those paragraphs of the PSR. Because the court did not consider O’Con-nor’s ability to pay the restitution order, as it was required to do before enactment of the MVRA the order was defective.
 

 No timely objection was made, so we must decide whether the error was plain. According to the PSR, O’Connor has no assets, nor the ability to pay a fíne. Because the amount of restitution was discretionary, and because O’Connor was insolvent, the error affected O’Connor’s substantial rights and was therefore plain.
 
 See United States v. Edwards,
 
 162 F.3d 87, 92 n. 7 (3d Cir.1998) (finding plain error where MVRA applied retroactively). We vacate the district court’s restitution order and remand for further proceedings.
 
 [4]
 

 V.
 

 Before oral argument, O’Connor filed a motion to allow supplemental briefing on the effect of
 
 Blakely v. Washington,
 
 — U.S. -, 124 S.Ct. 2531, 159 L.Ed.2d 403 (June 24, 2004). She argued that the jury’s verdict permitted a maximum sentence of six months, but the district court
 
 *1065
 
 based its eighteen-month sentence upon its determination that the amount of loss warranted a seven-level increase in her sentence. After this appeal was submitted, we decided
 
 United States v. Ameline,
 
 376 F.3d 967 (9th Cir.2004), which allows us to consider a
 
 Blakely
 
 challenge raised after briefing.
 
 Id.; see also United States v. Castro,
 
 No. 03-50444, *3 (9th Cir. Aug. 27, 2004).
 

 Because the district court enhanced O’Connor’s sentence seven levels on. the basis on an amount of loss that was neither found by the jury nor alleged in the indictment, there is plain error.
 
 See Ameline,
 
 376 F.3d at 980. Given that the district court must recalculate O’Connor’s restitution order, we vacate O’Connor’s sentence now and remand for further proceedings, rather than await further briefing in this developing area of sentencing law.
 

 VI.
 

 Montgomery’s convictions are REVERSED, and his case is REMANDED for a new trial. O’Connor’s convictions are AFFIRMED, but the restitution order and her sentence are VACATED and REMANDED.
 

 [1]
 

 . The following states and the District of Columbia permit either spouse to invoke the privilege.
 
 See
 
 Ala. R. Evid. 504; Alaska R. Evid. 505(b); Ariz.Rev.Stat. Ann. § 12-2232, 13-4062; Ark.Code Ann. § 16-41-101 (Rule 504); Cal. Evid.Code § 980; Del. R. Evid. 504; D.C.Code Ann. § 14 — 306(b); Fla. Stat. Ann. § 90.504; Haw.Rev.Stat. § 626-1, Rule 505; Idaho Code § 9-203(1); 725 Ill. Comp. Stat. Ann. § 5/115-16; Iowa Code § 622.9; Kan. Stat. Ann. § 60-423(b); La.Code Evid. Ann. art. 504; Md.Code Ann., Cts & Jud. Proc. § 9-105; Minn.Stat. Ann. § 595.02(l)(a); Miss. R. Evid. 504; Mo.Rev. Stat. § 546.260; Mont.Code Ann. § 26-1-802; Neb.Rev.Stat. § 27-505(1); Nev.Rev. Stat. 49.295(1); N.H. R. Evid. 504; N.Y. C.P.L.R. 4502(b); N.D. R. Evid. 504; Ohio Rev.Code Ann. § 2317.02(d); Okla. Stat. Ann. tit. 12, § 2504; Or.Rev.Stat. § 40.255(2); 42 Pa. Cons.Stat. § 5914; S.D. Codified Laws § 19-13-13; Utah Code Ann. § 78-24-8(l)(a); Wash. Rev.Code § 5.60.060(1); W. Va.Code § 57-3-4; Wis. Stat. § 905.05;
 
 Curran v. Pasek,
 
 886 P.2d 272, 277 (Wyo.1994). Each of the remaining states either vests the privilege in the communicating spouse or does not have a clear rule.
 

 [2]
 

 . Montgomery also contends that a note written to him by Mrs. Montgomery on a business record was a privileged communication. The parties have focused their arguments on the letter, and the record is unclear about the circumstances under which the note was created or given to Montgomery. In light of our holding, we need not decide whether the note was a privileged communication.
 

 [3]
 

 . Even were we to conclude that Mrs. Montgomery could be classified as an accessory after the fact, we would not find that exception applicable for the same reason' — Mrs. Montgomery’s statements were made prior to her participation.
 

 [4]
 

 .
 
 On
 
 remand the district court shall also determine, in accordance with
 
 United States v. Riley,
 
 335 F.3d 919, 928 (9th Cir.2003), the scope of
 
 the
 
 criminal activity that O'Connor agreed to undertake.